CONNECTICUT FIRE INS. CO. v. BUCHANAN.

NATIONAL FIRE INS. CO. v. SAME.

(Circuit Court of Appeals, Eighth Circuit. September 27, 1905.)

Nos. 2,193, 2,194.

1. INSURANCE—POLICY—CONDITION RELATING TO USE AND OCCUPANCY OF BUILDING CONSTRUED.

One of the policies in suit insured a building as a "normal school and dwelling," and the other insured it "occupied and only while occupied as a normal school and dwelling." Both declared: "If the occupants

should be changed, except change of occupants without increase of hazard, or if the use be changed, * * * it shall be held to be an election on the part of the insured to cancel said policy, and the said policy shall stand canceled." And also: "This entire policy * * * shall be void * * * if the building, * * * whether intended for occupancy by owner or tenant, be or become vacant or unoccupied." *Held*, these provisions are consistent, certain, and unambiguous; the difference in the two policies is one of words, not of meaning or legal effect; and both plainly contemplate use and occupancy of the building as a normal school and dwelling, and make the same a condition to the acceptance and continuance of the risk.

2. SAME—EVIDENCE—BREACH OF CONDITION SHOWN.

At the time of the loss the building was used for the temporary storage of the library and a portion of the household effects of a teacher formerly living therein. Its use for school purposes had been suspended for an indefinite period, not in the sense of an ordinary recess or vacation, but in the sense of an absolute suspension of the school by those who had been conducting it. A lease contemplating the establishment of another school of the same character had been negotiated, but the tenant had not arrived or taken possession. No one was living in the building, and it was not the abode of any one who was only temporarily absent. *Held*, that the condition respecting the use and occupancy of the building was broken, and that there was no liability under the policies for the loss.

[Ed. Note.—For cases in point, see vol. 28, Cent. Dig. Insurance, §§ 751–753.]

3. EVIDENCE—PAROL EVIDENCE TO VARY TERMS OF WRITTEN POLICY.

In the absence of fraud or mutual mistake, no representation, promise, or agreement made, or opinion expressed, in the previous parol negotiations, as to the terms or legal effect of the resulting written contract, can be permitted to prevail, either in law or in equity, over the plain provisions and proper interpretation of the contract.

4. SAME—PRINCIPLE OF ESTOPPEL IN PAIS NOT APPLICABLE.

The theory that proof of prior and contemporaneous negotiations and representations, though not admissible to vary the terms or legal effect of the written contract, may be received for the purpose of raising an estoppel in pais, is a mere evasion of the salutary rule which protects written contracts from impeachment by loose collateral evidence, and upon principle and authority is not tenable.

(Syllabus by the Court.)

In Error to the Circuit Court of the United States for the Southern District of Iowa.

These cases are so nearly alike that they may be considered together. In separate actions at law upon two policies of fire insurance, one issued by the National Fire Insurance Company, of Hartford, Conn., and the other by the Connecticut Fire Insurance Company, of the same place, E. M. Buchanan, the insured, recovered verdicts and judgments against the insurers. The actions related to the same loss by fire and were consolidated for purposes of trial. The policies covered the same building at Humeston, Iowa, were issued by the same local recording agent, bore the same date, April 1, 1903, and were to continue in force one year from that date, unless avoided or terminated as therein provided. The insurance stipulated for in one policy was "against all direct loss or damage by fire, except as hereinafter provided, * * * on the two and three story frame building .* * * occupied, and only while occupied, as a normal school and dwelling house," and that stipulated for in the other policy was "against all direct loss or damage by fire, except as hereinafter provided, * * * on two and three story frame normal school and dwelling house." It was further stipulated in both policies: "This entire policy, unless otherwise provided by agreement indorsed hereon or added hereto, shall be void * * * if the building herein described, whether intended for occupancy by owner or tenant, be or become vacant or

unoccupied. It is understood, and the insured by accepting this policy so agrees, unless permission be indorsed hereon, that * * * if the possession be changed, or if the occupants should be changed, except change of occupants without increase of hazard, or if the use be changed, * * * then in every such case it shall be held to be an election on the part of the insured to cancel said policy and the said policy shall stand canceled from the happening of any one of the foregoing events, and the insured shall be entitled to receive, on return of this policy to the company, the unearned premium from date of surrender. It is understood, and the insured by the acceptance of this policy so agrees, that * * * any change of use, or any change of occupancy (except change of tenants without increase of hazard), is in each instance an increase of hazard within the meaning of section 1743, Code of Iowa. This policy is made and accepted subject to the foregoing stipulations and conditions, together with such other provisions, agreements, or conditions as may be indorsed hereon or added hereto, and no officer, agent, or other representative of this company, except the manager of this company in Chicago, shall have power to waive, change, or modify any provision or condition of this policy, except such as by the terms of this policy may be the subject of agreement indorsed hereon or added hereto, and as to such provisions and conditions no officer, agent, or representative, except the manager of this company in Chicago, shall have such power or be deemed or held to have waived, changed, or modified such provision or conditions, and such waiver, if any, shall be written upon or attached hereto, nor shall any privilege nor permission affecting the insurance under this policy exist or be claimed by the insured unless so written or attached." No indorsement upon or written addition to either of the policies was made, at the time of their issuance or afterwards, by either the local recording agent or the manager in Chicago.

The building was destroyed by fire May 20, 1903. The principal defense interposed to the actions upon the policies was that at the time of the fire and for a long time prior thereto the building was not used or occupied as a normal school or as a dwelling, but was vacant and unoccupied, by reason of which the policies were inoperative and void. With their answers the defendants paid into court and tendered to the plaintiff the amount of the premiums paid on the policies, with interest thereon from the date of payment. The plaintiff replied, denying that the building was vacant or unoccupied, and stating that it had been used for normal school purposes to within six months of the fire; that at the time the policies were issued and thence to the time of the fire the household furniture and library of one Heskett was stored in the building; that the recording agent who issued the policies had at the time actual knowledge of how, and the extent to which, the building was used and occupied, and that by reason thereof the defendants were estopped from interposing the defense of vacancy and nonoccupancy, and had waived the stipulations in the policy respecting the use and occupancy of the building. Another matter alleged in an amendment to the reply—that these stipulations had been orally waived by the agent after the policies were issued—need not be considered, because there was no evidence to sustain it.

The facts shown by the evidence were these: The building was designed and arranged for use as a normal school and dwelling, and was so used and occupied for several years; the school being conducted during nine months of each year, and one of the teachers, with his family, living in the building throughout the year. The use for normal school purposes ceased in the summer of 1902, and had not been resumed at the time of the fire, May 20, 1903, although a lease contemplating the resumption of that use was negotiated three months before. The tenants had not arrived or taken possession. Heskett, the former resident teacher, with his family, moved out of the building in December, 1902, leaving his library and a portion of their household effects, not required for living purposes in their new abode, stored in some of the rooms. Shortly thereafter one Dotson, with his family, moved into two of the living rooms and resided there until about March 18, 1903, when they went elsewhere. At that time one Sires moved his household effects into some of the rooms, and also put his dog in the building. April 7th, Sires, with his family, set up housekeeping there. May 4th they went elsewhere with their effects,

including the dog. No one was actually living in the building, nor was it the home or abode of any one who was temporarily absent, either when the policies were issued, April 1st, or when the fire occurred, May 20th.

Referring to the extent to which he exercised a supervision over his effects, which remained stored in the building until the fire, Heskett testified: "I visited the building a part of the time twice a day. The visits were to the part designated as the kitchen on the first floor. The period I was there every day was two or three months commencing from the beginning of the winter until the 1st of May, say from the middle of December to the 1st of May. When I went to the room alone, I went for the purpose of getting ground feed for my cow. This was the kitchen on the first floor. There were stored in there some articles of kitchen furniture and the feed that I used for my cow. That was the purpose for which I went there every day. * * * I went to and through the rooms our goods were in two or three times a week. I went there for the purpose of getting articles I wanted to use, and sometimes I went in to see that all of the goods were intact." In like manner, but referring only to the period intervening between March 18th and April 7th, Sires testified: "We had a dog there that remained in the normal school building. I kept it there and fed it there. * * * I went back and forth to the rooms, and went into the rooms. Did not remain there very long."

The evidence relating to the negotiations leading up to the issuance of the policies, and relating to the knowledge possessed by the local recording agent, Calbreath, at that time, respecting the condition of the building, was as follows: Calbreath testified: "When I wrote the policies sued upon I knew the conditions and manner in which the building was occupied on the 1st day of April, 1903. It was occupied by Mr. Heskett. No one else occupied it to my knowledge. I knew Mr. Heskett occupied it. I do not know what Mr. Heskett had in the building, because I never was in the rooms. At the time I wrote the risk I did not know of any one occupying the building in any manner than in the manner I stated it was occupied by Mr. Heskett. I knew that at the time the policies were written and delivered. * * * I did not know whether a tenant had moved in when Mr. Heskett moved out, nor whether a tenant had moved out and another moved in or not, when these policies were issued. * * * I didn't know whether a family was living in those rooms or not when I issued the policies. I knew that Mr. Heskett had moved out. Moved his family to the hotel. I knew he was at the hotel. I don't know the Dotsons that moved in there after Mr. Heskett moved out. Didn't know that Mr. Dotson was in there at all. Q. Then for aught you knew, or these companies, the building was occupied by a family when these policies were issued? A. That was my understanding. It was my understanding that Mr. Heskett remaining and keeping the building in control was an occupancy. That is the reason why— Q. You did not know whether any other family was living in there or not? A. No. sir. * * * When I issued the policies I had a conversation with Mr. Buchanan. I went to him about the renewal of the policies. I did not go to Mrs. Buchanan. My conversation was with her agent. He told me the building was to be occupied as a normal school building. I think he said the man was to be there either in May or June. Did not ask him whether he was going to move there with his family. All that was said was that he had about rented or had rented the building, and the man was going to occupy it as a normal school. There was nothing said about the present occupancy of the building. Not a word, I think." C. E. Buchanan, who was the husband of the plaintiff, managed the property for her, and obtained the issuance of the policies, testified that he told Calbreath "how the building was occupied" and showed him the lease before named, and that in a conversation occurring about a week before the policies were issued, and having reference to whether or not it would be necessary to obtain a vacancy permit and to pay extra insurance, Calbreath said: "You don't have to. I understand the occupancy, and you don't have to do anything of the kind. The man [new tenant] is coming here, and school is going to open right away, and you don't have to do anything of the kind."

Calbreath's duties as agent of the defendant companies, save as his authority may have been restricted by the terms of the policies, were those of

soliciting insurance, writing and delivering policies, receiving premiums, and making the necessary endorsements and transfers.. There was no evidence of any act or conduct of Calbreath, after the policies were issued, upon which a waiver of any of their conditions could be predicated, even if he was authorized to waive them. Much of the evidence here recited was admitted over the objections of the defendants, and their request for a directed verdict in their favor, made at the conclusion of the evidence, was denied.

The Iowa Code of 1897 contains these provisions:

"Sec. 1743. Any condition or stipulation in an application, policy or contract of insurance, making a policy void before the loss occurs, shall not prevent recovery thereon by the insured, if it shall be shown by the plaintiff that the failure to observe such provision or the violation thereof did not contribute to the loss: Provided, however, that any condition or stipulation referring * * * to vacancy of the insured premises, * * * or to a change in the occupancy or use of the property insured, if such . * * * change or use makes the risk more hazardous, * * * shall not be * * * affected by this provision."

"Sec. 1749. Any person who shall hereafter solicit insurance or procure application therefor shall be held to be the soliciting agent of the insurance company or association issuing a policy on such application or on a renewal thereof, anything in the application, policy or contract to the contrary notwithstanding.

"Sec. 1750. * * * Any officer, agent or representative of an insurance company doing business in this state who may solicit insurance, procure applications, issue policies, adjust losses or transact the business generally of such companies, shall be held to be the agent of such insurance company with authority to transact all business within the scope of his employment, anything in the application, policy, contract, by-laws or articles of incorporation of such company to the contrary notwithstanding."

George H. Carr, James P. Hewitt, A. C. Parker, and Craig T. Wright, for plaintiffs in error.

Lewis Miles and C. W. Steele, for defendant in error.

Before VAN DEVANTER, HOOK, and ADAMS, Circuit Judges.

VAN DEVANTER, Circuit Judge, after stating the case as above, delivered the opinion of the court.

One of the policies insured the building as a "normal school and dwelling," and the other insured it "occupied and only while occupied as a normal school and dwelling." Both declared:

"If the occupants should be changed, except change of occupants without increase of hazard, or if the use be changed, * * * it shall be held to be an election on the part of the insured to cancel said policy, and the said policy shall stand canceled."

And also:

"This entire policy * * * shall be void * * * if the building, * * * whether intended for occupancy by owner or tenant, be or become vacant or unoccupied."

These provisions are consistent, certain, and unambiguous, and counsel for the insured do not even suggest that they are otherwise. The difference in the two policies is one of words only, not of meaning or legal effect. Both plainly contemplate use and occupancy of the building as a normal school and dwelling, and make the same a condition to the acceptance and continuance of the risk. Words could hardly have been chosen to better or more certainly express the purpose of the parties to exclude liability on the part of the insurers for

any loss occurring when the building was without the care, supervision, and protection involved in such use and occupancy. The only use made of the building at the time of the fire was as a place for the temporary storage of the library and a portion of the household effects of a teacher formerly living therein. Its use for normal school purposes had ceased, not in the sense of a temporary suspension of school work during an ordinary recess or customary vacation, but in the sense of an absolute suspension of the school by those who had been conducting it. A lease contemplating the establishment of another school of the same character had been negotiated, but the tenant had not arrived or taken possession. No one was actually living in the building, and it was not the home or abode of any one who was only temporarily absent. Occasional visits were made to the building by the former resident teacher, in connection with his library and effects, which were temporarily stored therein; but he and his family were living elsewhere. In these circumstances the building was unquestionably without the care, supervision, and protection necessarily incident to its use and occupancy as a normal school and dwelling, and was vacant and unoccupied within the meaning of the policies. Limburg v. German Fire Ins. Co., 90 Iowa, 709, 57 N. W. 626, 23 L. R. A. 99, 48 Am. St. Rep. 468; Feshe v. Council Bluffs Ins. Co., 74 Iowa, 676, 39 N. W. 87; Ashworth v. Builders' Mutual Fire Ins. Co., 112 Mass. 422, 17 Am. Rep. 117; Corrigan v. Connecticut Fire Ins. Co., 122 Mass. 298; Herrman v. Adriatic Fire Ins. Co., 85 N. Y. 162, 39 Am. Rep. 644; Halpin v. Phœnix Ins. Co., 118 N. Y. 165, 174, 23 N. E. 482; Halpin v. Ætna Fire Ins. Co., 120 N. Y. 70, 23 N. E. 988; Cook v. Continental Ins. Co., 70 Mo. 610, 35 Am. Rep. 438; American Ins. Co. v. Padfield, 78 Ill. 167; Bennett v. Agricultural Ins. Co., 50 Conn. 420; Moore v. Phœnix Ins. Co. (N. H.) 6 Atl. 27, 10 Am. St. Rep. 384; Continental Ins. Co. v. Kyle (Ind.) 24 N. E. 727, 9 L. R. A. 81, 19 Am. St. Rep. 77; Watertown Fire Ins. Co. v. Cherry (Va.) 3 S. E. 876; Weidert v. State Ins. Co. (Ore.) 24 Pac. 242, 249, 20 Am. St. Rep. 809.

Counsel for the insured neither concede nor controvert the conclusion last stated, but make this contention: The condition of the building when the fire occurred was the same as when the policies were issued. The recording agent issued the policies with full knowledge of that condition, and his knowledge was the knowledge of the insurers. "Oral testimony is competent to show the knowledge of the agent. * * * Certainly if the plaintiff in error knew the condition of the property as to occupancy at the time the policy sued on herein was issued, it is estopped from setting up said condition as a defense in this suit. If the property was not occupied, and the plaintiff in error knew that fact at the time the policy was issued, then it appears to us that the law is well settled that the plaintiff in error waived any condition in the policy as to the matter of occupancy." In the view which must be taken of the attempt to thus vary and contradict the terms of the written policies, it will not be necessary to consider some of the matters discussed in the briefs; viz.: Whether the condition of the building when the fire occurred was the same as

when the policies were issued; whether Sires' intervening occupancy of a portion of the building as a dwelling terminated the claimed waiver and avoids an estoppel; and whether the statutes of Iowa (Code 1897, §§ 1749, 1750) are valid and have the effect of preventing any limitation upon the authority of insurance agents within that state.

The question for decision is this: When the parties to written policies of insurance have in plain and unambiguous terms declared it to be their intention that the insurance shall cover a described building while it is used and occupied as a normal school and dwelling, and shall be inoperative if and when the building is not so used or occupied, may it be shown by oral testimony—there being no charge of fraud or mutual mistake in reducing the agreement to writing, and the actions upon the policies being at law—that it was in fact the intention of the parties that the insurance should cover the building when not so used or occupied, but clearly vacant and unoccupied within the meaning of the policies? Although the question is discussed by counsel for the insured as if it were one of waiver or estoppel, its real character cannot be obscured or disguised. Stated in its simplest form, the question is whether or not, in actions at law upon written policies of insurance, oral testimony of the conditions existing when the policies were issued and of the contemporaneous and prior negotiations of the parties may be availed of to enable the insured to recover for a loss which the policies in plain and unambiguous terms declare shall give no right of recovery? Upon principle and upon the authority of controlling decisions of the Supreme Court of the United States the question must be answered in the negative. But in deference to the ruling to the contrary by the learned judge who presided at the trial a somewhat extended reference will be made to the authorities deemed applicable.

As much is said in the briefs respecting the statutes of Iowa, set forth in the foregoing statement (Code 1897, §§ 1749, 1750), and the decision of the Supreme Court of the state in Liquid Carbonic Acid Mfg. Co. v. Phœnix Ins. Co., 101 N. W. 749, holding that these statutes were enacted "for the express purpose of prohibiting the limitation of the agent's power by provisions in the contract," it will be assumed, without considering the validity or effect of the statutes, that the recording agent had full authority to represent the insurers and that the provisions in the policies designed to limit his authority are inoperative. In this connection, however, it should be observed that no question of the admissibility of oral testimony of the conditions existing when the policy was issued or of contemporaneous or prior negotiations was presented in Liquid Carbonic Acid Mfg. Co. v. Phœnix Ins. Co., but only the question whether subsequently to the issuance of the policy the agent could orally waive its conditions, notwithstanding the limitations attempted to be placed upon his authority. The conclusion was that these limitations were in conflict with the statutes and inoperative, and that he could orally waive conditions of the policy subsequently to its issuance, a question entirely apart from the present discussion.

The rule inhibiting resort to parol evidence of contemporaneous or prior conditions or negotiations to supersede, contradict, or vary valid written contracts is stated in Starkie on Evidence (10th Am. Ed.) 647, in this manner:

"It is likewise a general and most inflexible rule that wherever written instruments are appointed, either by the requirement of law or by the compact of parties, to be the repositories and memorials of truth, any other evidence is excluded from being used, either as a substitute for such instruments or to contradict or alter them. This is a matter both of principle and policy—of principle, because such instruments are in their own nature and origin entitled to a much higher degree of credit than parol evidence; of policy, because it would be attended with great mischief if those instruments upon which men's rights depended were liable to be impeached by loose collateral evidence."

This rule is fully recognized by the decisions of the Supreme Court of the state in which this controversy arose. Fawkner v. Lew Smith Wall Paper Co., 88 Iowa, 169, 55 N. W. 200, 45 Am. St. Rep. 230; Congower v. Equitable Mutual Life and Endowment Ass'n, 94 Iowa, 499, 505, 63 N. W. 192. It is also well stated, and sustained by the citation of many cases, in 17 Cyc. 567–571, 596, 606, 662.

In Glendale Woolen Co. v. Protection Ins. Co., 21 Conn. 19, 36, 54 Am. Dec. 309, where the rule was applied in an action upon a policy of fire insurance, it was said:

"If we have the precise contract which the parties chose to make for themselves, and there be no imperfection or ambiguity in the language used to express the meaning of the parties, clearly we have no right to depart from the language, and travel out of the contract, to see if the parties did not, after all, mean something different from what is written. Why, we ask, resort to inferior and secondary evidence, such as inferences from supposed usages or circumstances, or the knowledge or the talk of the parties, at the time of entering into the contract? * * * The rule is well established that when the parties have deliberately put their engagements into writing in such terms as import a legal obligation, without any uncertainty as to the object or extent of such engagement, it is conclusively presumed that the whole engagement of the parties and the extent and manner of their undertaking was reduced to writing. After this, to permit oral testimony of prior or contemporaneous conversation, or circumstances, or usages, etc., in order to learn what was intended or to contradict what is written, would be dangerous and unjust in the extreme."

Batchelder v. Queen Ins. Co., 135 Mass. 449, was an action upon a policy of fire insurance conditioned to be void if there was other insurance. To avoid the defense that there was other insurance when the policy was issued, the insured sought to show that the insurer had full knowledge thereof at the time, and claimed that the issuance of the policy with such knowledge was a waiver of the condition. Mr. Justice Holmes, then a member of the Supreme Judicial Court of Massachusetts, delivered the opinion of the court, saying:

"A breach of condition, happening after a policy is issued, may be waived, no doubt; but when the breach exists at the moment when, if ever, the contract comes into existence, it must be waived at that moment, if ever, and at that very instant the writing purports to establish and insist upon the condition. We must follow the decisions that parol evidence of such a waiver as is relied on in this case would contradict the written instrument upon which the suit is brought."

In Atherton v. Brown, 14 Mass. 152, it was held that the words in a policy "on board Spanish brig New Constitution" amounted to a warranty that the vessel was Spanish, and that it was not competent for the insured to show by parol, in avoidance of a breach of the warranty, that the insurer knew the true character of the vessel at the time of issuing the policy.

Jennings v. Chenango County Mutual Ins. Co., 2 Denio, 75, was assumpsit on a policy of fire insurance. There was a breach of the conditions of the policy respecting the occupancy and location of the insured building, and it was held the effect of the breach could not be avoided by parol evidence that the insurer was informed of and assented to the true occupancy and location of the building before the policy was issued.

In Higginson v. Dall, 13 Mass. 96, an underwriter sought to prevent a recovery by parol proof of a prior understanding that the policy should be conditional, when by its terms it was absolute. It was held this could not be done, Chief Justice Parker observing:

"The policy itself is considered to be the contract between the parties; and whenever proposals are made, or conversations had, between the parties, prior to the subscription, they are to be considered as waived, if not inserted in the policy, or contained in a memorandum annexed to it."

New York Ins. Co. v. Thomas, 3 Johns. Cas. 1, is a case wherein it was sought to explain by proof of the prior negotiations that a provision in a policy relating to prior insurance was intended to include subsequent insurance as well. Judge Kent, afterwards Chancellor, disposed of the matter in this manner:

"I know no rule better established than that parol evidence shall not be admitted to disannul or substantially vary or extend a written agreement. The admission of such testimony would be mischievous and inconvenient. Parol evidence is to be received in the case of an ambiguitas latens to ascertain the identity of a person or thing; but before the parol evidence is to be received in such case the latent ambiguity must be made out and shown to the court. In the present instance, there is no ambiguity. The language of the contract throughout is consistent and explicit. The general rule of law has been particularly and emphatically applied to policies. Skinn. 54. And, except in the special instance of explanations resulting from the usage of trade, they have never been allowed to be contradicted by parol agreements. Without, therefore, giving any opinion, what would be the effect of the parol proof, if admissible, we think it was inadmissible."

Dewees v. Manhattan Ins. Co., 35 N. J. Law, 366, is especially in point and is worthy of particular attention, as in Northern Assurance Co. v. Grand View Building Association, infra, the Supreme Court of the United States referred to the opinion and quoted therefrom at length, saying:

"It contains, as we think, an able and sound statement of the law on this important subject."

The action was assumpsit on an insurance on a building "occupied by the assured for country store" and on his stock of merchandise therein. One of the stipulations of the policy declared that it should be of no effect if the building should be subjected to more hazardous uses, one of which was that of keeping a private stable. It appeared on the trial that at the date of the policy and at the date of the fire a

portion of the building was applied to the excepted use, and that the agent of the insurer knew of this use when the policy was issued. In the course of delivering the opinion it was said by Chief Justice Beasley:

"The contract between these litigants, on the point which I shall discuss, is clear and unambiguous. The defendants agreed to insure a building occupied as a country store, and the stock of goods, consisting of the usual variety of a country store. This, by the plain meaning of the terms employed, is a warranty on the part of the insured that the building was used, at the date of the agreement, for the purpose specified. It was a representation on the face of the policy touching the premises in question and which affected the risk; and such a representation, according to all the authorities, amounts to a warranty. * * * It can be intended for no other purpose than to characterize the use of the building at the date of the insurance; for, unless this be done, there can be no restriction on the use of the property by the insured during the running of the risk. Unless this description has the force thus attributed to it, the premises could have been used for any of the most hazardous purposes. A building described in a policy as a 'dwelling house' could, except for the rule above stated, be converted into a mill or a factory. I think it is incontestably clear that the description of the use of the premises in this case was meant to define the character of the risk to be assumed by the defendants. * * * The contract of these parties, as it has been committed to writing, is that, if the plaintiff shall keep a stable on the premises insured, for the time being the policy shall be vacated. But it is said the agent of the defendants who procured this contract was aware that the real contract designed to be made was that the plaintiff might apply the premises to this use. This knowledge of the agent of the defendants, and which, it is conceded, will bind the defendants, is to have the effect to vary the obligations of the written contract. Upon what principle is this to be done?"

The want of power in a court of law to reform the policy on the ground of mutual mistake, if there were such, was adverted to, and the opinion proceeded:

"Nor do I think, if this court should sustain the present action, that it could be practicable to preserve in any useful form the great primary rule that written instruments are not to be varied or contradicted by parol evidence. The knowledge of the agent, in the present transaction, is important only as showing what the tacit understanding of the contracting parties was. Suppose, instead of proof of such tacit understanding, the plaintiff had offered to make a stronger case, by showing that the agent expressly agreed that the building might be used, not as a country store, as the policy stated, but also as a stable, and that the restraining stipulation did not apply to the extent expressed; can any one doubt that, according to the practice and decisions in this state, such proofs should have been rejected? A rule of law admitting such evidence would be a repeal of the principle giving a controlling efficacy to written agreements. The memory and understanding of those present at the formation of the contract would be quite as potent as the written instrument."

Referring to a case which was claimed to establish the doctrine that parol evidence of contemporaneous and prior negotiations, while not admissible for the purpose of altering or contradicting a written contract, was admissible to establish an estoppel in pais, it was further said:

"I think there is no doubt that this application of the doctrine of estoppel to written contracts is an entire novelty. In the long line of innumerable cases which have proceeded and been decided on the ground that parol evidence is not admissible as against a written instrument, no judge or counsel has ever intimated, as it is believed, that the same result could be substantially attained by a resort to this circuity. It is true that, if there be a substantial

ground in legal principle for its introduction, the fact that it is new will not debar from its adoption; but I have not been able to perceive the existence of such substantial ground. In my apprehension, the doctrine can be made to appear plausible only by closing the eyes to the reason of the rule which rejects, in the presence of written contracts, evidence by parol. That reason is that the common good requires that it shall be conclusively presumed in an action at law, in the absence of deceit, that the parties have committed their real understanding to writing. Hence it necessarily follows that all evidence merely oral is rejected whose effect is to vary or contradict such expressed understanding. Such rejection arises from the consideration that oral testimony is unreliable in comparison with that which is written. It is idle to say that the estoppel, if permitted to operate, will prevent a fraud or inequitable result. Most parol evidence contradictory of a written instrument has the same tendency; but such evidence is rejected, not because, if true, it ought not to be received, but because the written instrument is the safer criterion of what was the real intention of the contracting parties. In the case now criticised, the party insured stipulated against the existence of buildings within a definite number of feet from the insured property. By the admission of parol testimony this stipulation was restricted and limited in its effect. This result, no doubt, was strictly just, if we assume that the parol evidence was true; but, standing opposed to the written evidence, the law presumed the reverse. The alternative is unavoidable. It is a choice between that which is written and that which is unwritten. In the case cited the effect of the rule adopted by the court was to give a different effect to the written terms from that which they intrinsically possessed—a result induced by the admission of oral evidence. This, I cannot but think, was a palpable alteration of the agreement of the parties. The mistake of the court appears to have been in regarding simply the legal effect of the facts which were proved by parol. Receiving that testimony into the case, a clear estoppel was made out; but the error consisted in the circumstance that such oral evidence was, on rules well settled, inadmissible. The question presented was purely one as to a rule of evidence, but it was treated as a problem relating to the application of general legal principles to an additional state of facts. The case was not decided by a unanimous court. Three judges dissented, and, in my judgment, that dissent was based on satisfactory grounds. But it has been already observed that, even if the doctrine of this adjudication should be received by this court, such result could have no effect on our decision of the present case. The reason is that the facts now before us do not present the elements of an estoppel. Such a defense rests on a misconception as to a state of facts, induced by the party against whom it is set up. The person who seeks to take advantage of it must have been misled by the words or conduct of another. Now, in the present case, the agent did not make any statement, nor did he do anything, which led the plaintiff to alter his condition. The most that can be laid to his charge is that, from carelessness, he omitted properly to describe the use of the premises insured. But this was not a misstatement of a fact on which the plaintiff acted, because the plaintiff was aware of the circumstances that the building was put to another use. The alleged error in the description is plain on the face of the policy, and the law incontestably charges the defendant with knowledge of the meaning and legal effect of his own written contract. Certainly the entire state of things was as well known to the plaintiff as it was to the agent of the defendants. To found an estoppel on the ignorance of the plaintiff of the plainly expressed meaning of his own contract would be absurd."

Another case which was extensively and approvingly quoted from in Northern Assurance Co. v. Grand View Building Association, infra, is Franklin Ins. Co. v. Martin, 40 N. J. Law, 568, 29 Am. Rep. 271. The facts, so far as material to the present discussion, were these: The policy sued upon described the building insured as "occupied as a dwelling and boarding house." In fact it was also occupied as a country tavern, and one of the rooms was maintained as a billiard

room. This continued to be the condition at the time of the fire. The policy showed that taverns and billiard rooms were classified as extrahazardous risks. The trial court, having admitted evidence that the agent of the insurer inspected the building before issuing the policy and knew the manner in which it was used, left the question to the jury whether the parties did not intentionally use the term "boarding house" to describe the very thing that was insured. The opinion declares that the words "occupied as a dwelling and boarding house" defined the character of the risk assumed, and constituted a warranty that the building was at the time used for that purpose, and also holds:

"It is manifest that the theory that such parol evidence, though it may not be competent to change the written contract, may be received for the purpose of raising an estoppel in pais, is a mere evasion of the rule excluding parol testimony when offered to alter a written contract. A party suing on a contract in an action at law must be conclusively presumed to be aware of what the contract contains, and the legal effect of his agreement is that its terms shall be complied with. Extrinsic evidence of the kind under consideration must entirely fail in its object, unless its purpose be to show that· the contract expressed in the written policy was not, in reality, the contract as made. A defendant cannot be estopped from making the defense that the contract sued on is not his contract, or that his adversary has himself violated it in those particulars which are made conditions to his rights under it, on the ground of negotiations and transactions occurring at the time the contract was entered into, unless the plaintiff is permitted to show, from such sources, that the contract as put in writing does not truly express the intention of the parties. The difficulty lies at the very threshold. An estoppel cannot arise except upon proof of a contract different from that contained in the written policy, and an inflexible rule of evidence forbids the introduction of such proof by parol testimony, when offered to vary or affect the terms of the written instrument. * * * The cases usually cited for the propositon that a contract of insurance is excepted out of the class of written contracts with respect to the admissibility of parol evidence to vary. or control the written contract will be found on examination to be to a large extent those in which the proof hàs · been received with a view to the reformation of the policy in equity, or to meet the defense that the contract was induced by false or fraudulent representations not embodied in the contract, or are the decisions of courts in which the legal and equitable jurisdictions are so blended that the functions of a court of equity have been transferred to the jury box. * * * How the contract was effected, whether directly with the insurer or by the intervention of agents, is of no consequence. The question of the admissibility of the testimony does not relate to the method by which the contract was made. It concerns the rule of evidence by which the contract, however made, shall be interpreted. Upon principle, it is impossible to perceive on what ground such testimony shall be received. A policy of insurance is a contract in writing of such a nature as to be within the general rule of law that a contract in writing cannot be varied or altered by parol testimony. If it be ambiguous in its terms, parol evidence such as would be competent to remove an ambiguity in other written contracts may be resorted to for the purpose of explaining its meaning. If it incorrectly or imperfectly expresses the actual agreement of the parties, it may be reformed in equity. If strict compliance with the conditions of insurance, with respect to matters to be done by the insured after the contract has been concluded, has been waived, such waiver may, in general, be shown by extrinsic evidence, by parol. Further than this it is not safe for a court of law to go. To except policies of insurance out of the class of contracts to which they belong, and deny them. the protection of the rule of law that a contract which is put in writing shall not be altered or varied by parol evidence of the contract the parties intended to make, as distinguished from what appears by the written contract to be that which they have in fact made, is a violation of principle that will open

the door to the grossest of frauds. * * * A court of law can do nothing but enforce the contract as the parties have made it. The legal rule that in courts of law the written contract shall be regarded as the sole repository of the intentions of the parties, and that its terms cannot be changed by parol testimony, is of the utmost importance in the trial of jury cases, and can never be departed from without the risk of disastrous consequences to the rights of parties. In the present case the property insured was described in the policy as a dwelling and boarding house. There was no ambiguity in the terms used that justified resort to extrinsic evidence to explain the meaning of the contract. The effect given to the testimony on this subject by the charge of the court was to change the terms of the contract and reform it, and make another and a different contract. In this there was error, for which the judgment should be reversed."

It should be observed that in none of the cases to which reference has been made was the decision made to turn upon any limitation upon the authority of the agent, or otherwise than upon the application of the salutary rule which prevents the subordination of unambiguous written contracts to parol proof of contemporaneous and prior conditions and negotiations. That the rule announced and applied in these cases has been treated by the Supreme Court of the United States as fundamental and invariable is attested by repeated decisions of that court, among which may be mentioned The Delaware, 14 Wall. 579, 20 L. Ed. 779; Insurance Co. v. Lyman, 15 Wall. 664, 21 L. Ed. 246; Hearne v. Marine Ins. Co., 20 Wall. 488, 22 L. Ed. 395; Brawley v. United States, 96 U. S. 168, 173, 24 L. Ed. 622; Insurance Co. v. Mowry, 96 U. S. 544, 24 L. Ed. 674; Thompson v. Insurance Co., 104 U. S. 252, 26 L. Ed. 765; Simpson v. United States, 172 U. S. 372, 379–381, 19 Sup. Ct. 222, 43 L. Ed. 482; Northern Assurance Co. v. Grand View Building Association, 183 U. S. 308, 22 Sup. Ct. 133, 46 L. Ed. 213.

In the case of The Delaware it was held it could not be shown in avoidance of a liability on a maritime bill of lading, the legal import of which, in the absence of a stipulation to the contrary, was that the goods should be stowed under deck, that in fact they were stowed on deck by the consent of the shippers and in pursuance of an oral agreement consummated before the goods were sent on board, and before the bill of lading was executed. The opinion contains this statement:

"Subsequent oral agreements in respect to a prior written agreement, not falling within the statute of frauds, may have the effect to enlarge the time of performance, or may vary any other of its terms, or, if founded upon a new consideration, may waive and discharge it altogether. Verbal agreements, however, between the parties to a written contract, are in general inadmissible to contradict or vary its terms or to affect its construction, as all such verbal agreements are considered as merged in the written contract."

In Insurance Co. v. Lyman, supra, where it was sought to recover on an oral contract of insurance differing from the written policy, the court held:

"Undoubtedly a valid verbal contract for insurance may be made, and when it is relied on, and is unembarrassed by any written contract for the same insurance, it can be proved and become the foundation of a recovery, as in all other cases where contracts may be made either by parol or in writing. But it is also true that when there is a written contract of insurance it must have the same effect, as the adopted mode of expressing what the contract is, that

it has in other classes of contract, and must have the same effect, in excluding parol testimony in its application to it, that other written instruments have."

In Hearne v. Marine Ins. Co., supra, it was said that the rule excluding parol proof where it is inconsistent with the written contract is not confined to what is stated in express terms, because "what is implied is as effectual as what is expressed," and that to establish the inconsistency "it is sufficient if it appears that the parties intended to be governed by what is written and not by anything else."

Insurance Co. v. Mowry, supra, was an action upon a policy of life insurance. The facts and the ruling in respect to a claim of estoppel in pais similar to that now insisted upon are fully shown in the following portion of the opinion:

"By the express condition of the policy the liability of the company was released upon the failure of the insured to pay the premium when it matured; and the plaintiff could not recover unless the force of this condition could in some way be overcome. He sought to overcome it by showing that the agent who induced him to apply for the policy represented to him, in answer to suggestions that he might not be informed when to pay the premiums, that the company would notify him in season to pay them, and that he need not give himself any uneasiness on that subject; that no such notification was given to him before the maturity of the second premium, and for that reason he did not pay it at the time required. This representation before the policy was issued, it was contended in the court below and in this court, constituted an estoppel upon the company against insisting upon the forfeiture of the policy. But to this position there is an obvious and complete answer. All previous verbal arrangements were merged in the written agreement. The understanding of the parties as to the amount of the insurance, the conditions upon which it should be payable, and the premium to be paid, was there expressed, for the very purpose of avoiding any controversy or question respecting them. The entire engagement of the parties, with all the conditions upon which its fulfillment could be claimed, must be conclusively presumed to be there stated. If by inadvertence or mistake provisions other than those intended were inserted, or stipulated provisions were omitted, the parties could have had recourse for a correction of the agreement to a court of equity, which is competent to give all needful relief in such cases. But, until thus corrected, the policy must be taken as expressing the final understanding of the assured and of the insurance company. The previous representation of the agent could in no respect operate as an estoppel against the company. Apart from the circumstance that the policy subsequently issued alone expressed its contract, an estoppel from the representations of a party can seldom arise, except where the representation relates to a matter of fact—to a present or past state of things. If the representation relate to something to be afterwards brought into existence, it will amount only to a declaration of intention or of opinion, liable to modification or abandonment upon a change of circumstances of which neither party can have any certain knowledge. The only case in which a representation as to the future can be held to operate as an estoppel is where it relates to an intended abandonment of an existing right, and is made to influence others, and by which they have been induced to act. An estoppel cannot arise from a promise as to future action with respect to a right to be acquired upon an agreement not yet made. The doctrine of estoppel is applied, with respect to representations of a party, to prevent their operating a fraud upon one who has been led to rely upon them. They would have that effect if a party who, by his statements as to matters of fact or as to his intended abandonment of existing rights, had designedly induced another to change his conduct or alter his condition in reliance upon them, could be permitted to deny the truth of his statements, or enforce his rights against his declared intention of abandonment. But the doctrine has no place for application when the statement relates to rights depending upon contracts yet to be made, to which the person complaining is to be a party. He has it in his

power in such cases to guard in advance against any consequences of a subsequent change of intention and conduct by the person with whom he is dealing. For compliance with arrangements respecting future transactions, parties must provide by stipulations in their agreements when reduced to writing. The doctrine carried to the extent for which the assured contends in this case would subvert the salutary rule that the written contract must prevail over previous verbal arrangements, and open the door to all the evils which that rule was intended to prevent."

In Thompson v. Insurance Co., supra, the court used this language:

"An insurance company may waive a forfeiture or may agree not to enforce a forfeiture; but a parol agreement, made at the time of issuing a policy, contradicting the terms of the policy itself, like any other parol agreement inconsistent with a written instrument made contemporary therewith, is void, and cannot be set up to contradict the writing."

A line of decisions sometimes claimed to be in opposition to those last cited is illustrated by the case of Insurance Co. v. Wilkinson, 13 Wall. 222, 20 L. Ed. 617, where an insurance company was held to be estopped from interposing as a defense to an action on a life policy the falsity of certain statements in the application upon which the policy was based, because these statements had been inserted in the application by the company's agent, notwithstanding truthful statements were made to him at the time by the insured. Referring to the rule which prevents written contracts from being contradicted or varied by parol, the opinion opens with this statement:

"The great value of the rule of evidence here invoked cannot be easily overestimated. As a means of protecting those who are honest, accurate, and prudent in making their contracts, against fraud and false swearing, against carelessness and inaccuracy, by furnishing evidence of what was intended by the parties, which can always be produced without fear of change or liability to misconstruction, the rule merits the eulogies it has received. But experience has shown that in reference to these very matters the rule is not perfect. The written instrument does not always represent the intention of both parties, and sometimes it fails to do so as to either; and where this has been the result of accident, or mistake, or fraud, the principle has been long recognized that under proper circumstances and in an appropriate proceeding the instrument may be set aside or reformed, as best suits the purposes of justice."

Language is then used which, if construed broadly and without reference to the facts of that case, might give support to the theory that the rule mentioned can be practically defeated by the application of the principle of estoppel in pais; but, as if to restrain the force of this language, the opinion concludes:

"This principle does not admit oral testimony to vary or contradict that which is in writing, but it goes upon the idea that the writing offered in evidence was not the instrument of the party whose name is signed to it; that it was procured under such circumstances by the other side as estops that side from using it or relying on its contents; not that it may be contradicted by oral testimony, but that it may be shown by such testimony that it cannot be lawfully used against the party whose name is signed to it."

This ruling was followed in Insurance Co. v. Mahone, 21 Wall. 152, 155, 22 L. Ed. 593, and in New Jersey Mutual Life Ins. Co. v. Baker, 94 U. S. 610, 614, 24 L. Ed. 268, to the extent only of holding the company estopped from asserting the falsity of statements in the application where it was prepared by the company's agent after truth-

ful statements were made to him by the insured. In Northern Assurance Co. v. Grand View Building Association, supra, Insurance Co. v. Wilkinson was relied upon by counsel for the insured as showing an abandonment of the doctrine announced and applied in earlier cases; but it was observed by the court, evidently to correct any misapprehension as to the extent of the decision relied upon, that the matter in respect of which parol testimony had been admitted—

"Was not a fact or statement contained in the policy sued on, but an extrinsic fact or statement contained in the application. The defense made upon that statement was, in legal effect, a denial of the execution of the statement—a defense that can always be sustained by parol evidence. However this may have been, we are unwilling to have the case regarded as one overthrowing a general rule of evidence. Some of the remarks contained in the opinion might seem to bear that interpretation, but not necessarily so. That Mr. Justice Miller did not intend, in the case of Insurance Company v. Wilkinson, to lay down a new rule of evidence in insurance cases, is clearly shown in the subsequent case of Insurance Co. v. Lyman, 15 Wall. 664, 21 L. Ed. 246, where the opinion was delivered by the same learned justice."

The case principally relied upon by counsel for the insured is Continental Life Ins. Co. v. Chamberlain, 132 U. S. 304, 10 Sup. Ct. 87, 33 L. Ed. 341. That was an action upon a life policy issued in Iowa. The facts were these: The blanks in the application upon which the policy was based were filled in by the agent for the company. One of the questions propounded therein was, "Has the party [applicant] any other insurance on his life?" When the question was read the applicant truthfully stated that he had certificates of membership in certain co-operative associations and that he did not know whether they would be considered insurance. The agent, having replied that co-operative associations were in no sense insurance companies and that he did not consider the certificates insurance, wrote the answer "No other" into the application and it was signed by the applicant. The certificates did constitute other life insurance. The defense interposed by the company was that the answer to the question was false and avoided the policy, which contained provisions to the effect that it would be void if there were any false statement in the application, that no statement made to the agent would be binding on the company unless written into the application, that the contract should be deemed to be fully set forth in the policy and the application, and that none of its terms could be modified or waived by the agent. The decision may be summarized as follows: (1) Under the Iowa statute (section 1749, supra) the agent represented the company, and not the insured, in preparing the application, notwithstanding the provisions of the policy, and his act in writing the answer, alleged to be untrue, was the act of the company. (2) The purport of the word "insurance" in the question was not so absolutely certain as to preclude proof of what kind of insurance the parties had in mind when the question was answered, and such proof did not contradict the written contract. (3) In these circumstances the company was estopped from asserting that the answer was the statement of the insured, or that the question and answer embraced insurance in co-operative associations. The case is certainly not an authority for the admission of parol testimony to contradict or vary a plain and unambiguous stipu-

lation in a written contract, whether offered in support of a claimed estoppel in pais or otherwise. In respect of this question it is not different from Insurance Co. v. Wilkinson.

In this connection it will be well to refer to the case of Marston v. Kennebec Mutual Life Ins. Co., 89 Me. 266, 36 Atl. 389, 56 Am. St. Rep. 412, cited by counsel for the insured. It was there held, following Insurance Co. v. Wilkinson and Continental Life Ins. Co. v. Chamberlain, that where the application, upon which the policy is issued, is drawn by an unauthorized agent of the insurer, and the answers to the interrogatories are written by him, without fraud or collusion on the part of the applicant, the insurer is estopped from controverting the truth of such answers in an action upon the policy; the reason for the ruling being that the answers are not the statements of the applicant but of the insurer. The case, however, makes a clear distinction between admitting parol testimony to show that the statements in the application are those of the insurer, through its authorized agent, and admitting such testimony to contradict or vary a statement or stipulation of the policy itself, as in the present cases— a distinction pointed out, as before shown, in Northern Assurance Co. v. Grand View Building Association, in the observation there made respecting Insurance Co. v. Wilkinson. Referring to a prior case in which parol testimony of a contemporaneous representation or assurance of the agent relating to the time within which the premium could be paid was held inadmissible, the Supreme Judicial Court of Maine states the distinction in the following language in the case cited (page 276 of 89 Me., page 392 of 36 Atl. [56 Am. St. Rep. 412]):

"But we think that case is to be distinguished from the case at bar. In that case the provision in relation to the time of payment of the premiums was one of the express terms of the contract, as much as was the amount of the insurance, the party insured, or to whom it was payable. They constituted the essential elements of a completed contract, and, of course, could not be varied by parol. But the questions and answers in the application in this case, while they form the 'basis of the contract,' are really propositions for a contract, or proposals upon which it is to be issued, if satisfactory to the company. The evidence which was held inadmissible in the one case and that which is received in the other bears upon entirely distinct propositions. In the former, it was excluded because it tended to vary a written contract by parol; in the latter, it becomes admissible to show that the recitals in the application are not, under the circumstances, the representations of the applicant, although signed by him, but the statements of the company, which had full knowledge of all the facts and which is estopped from controverting the truth of these statements."

McMaster v. New York Life Ins. Co., 183 U. S. 25, 22 Sup. Ct. 10, 46 L. Ed. 64, is also relied upon as sustaining the admission of oral testimony of the recording agent's knowledge of the condition of the insured building when the policies were issued and of his prior verbal assurance to the husband of the insured; and this, notwithstanding counsel make no claim that there is any inconsistency, uncertainty, or ambiguity in the provisions of the policies now in suit. That such is not the proper interpretation of the decision in that case is plain, for otherwise it would be in conflict, not only with many prior decisions which it does not mention, but also with the later decision in Northern Assurance Co. v. Grand View Building Association, which

does not mention it. The case was unusual in its facts, but it will sufficiently show what was presented for decision to say: The action was upon five life policies, which were dated and took effect December 18, 1893, but provided for the payment of annual premiums on December 12th in every year thereafter. The application was dated December 12, 1893, and contained a request that the policies bear the same date. The insured died January 18, 1895, without paying the second premiums. The policies provided for a grace of one month in the payment of premiums, and there was deemed to be an inconsistency and uncertainty in the provisions in respect of the period covered by the first premiums and of the forfeiture imposed for nonpayment of subsequent premiums. As to the second premiums, "it was conceded that payment on January 12th, in one view, and on January 18th, in the other, would have averted a forfeiture." In these circumstances it was held that oral testimony of extrinsic facts was properly received to show the interpretation which the parties put upon the inconsistent and uncertain provisions when the policies were issued, and to further show that the plaintiff was not estopped from asserting that the policies did not take effect in advance of their actual date, because the request respecting the dating of the policies, and therefore respecting the time when they should be effective, was inserted in the application by the company's agent without the knowledge of the applicant and was never assented to by him. The case is, therefore, like Continental Life Ins. Co. v. Chamberlain, which it cites and applies, and is not an authority for the admission of oral testimony to contradict or vary the plain and unambiguous terms of a written policy. Another matter which militates strongly against its use as such an authority is that the decision was ultimately rested upon the proper construction of the policies, irrespective of extrinsic facts, as is shown by the concluding portion of the opinion, which reads:

"The truth is the policies were not in force until December 18th, and as the premiums were to be paid annually, and were so paid in advance on delivery, the second payments were not demandable on December 12, 1894, as a condition of the continuance of the policies from the 12th to the 18th. And, as the policies could not be forfeited for nonpayment during that time, the month of grace could not be shortened by deducting the six days which belonged to McMaster of right. In our opinion the payment of the first year's premiums made the policies nonforfeitable for the period of 13 months, and inasmuch as the death of McMaster took place within that period the alleged forfeiture furnished no defense to the action."

If it be, as is insisted by counsel for the insured, that there is language in Continental Life Ins. Co. v. Chamberlain and in McMaster v. New York Life Ins. Co. which justifies the admission, by way of establishing an estoppel in pais, of oral testimony to contradict or vary the terms of a written contract in an action at law on the contract, such language cannot now be regarded as controlling, for the reason that the question has been ruled otherwise, in conformity with prior decisions, in the case of Northern Assurance Co. v. Grand View Building Association, 183 U. S. 308, 22 Sup. Ct. 133, 46 L. Ed. 213. which is the last deliverance of the court upon the subject; and, as illustrating that the decision in that case may properly be regarded as

having the effect of limiting any such language in the two intervening cases, it may be observed that the two learned members of the court who wrote the opinions in those cases dissented from the decision in the last one. It is, of course, the duty of this court to ascertain and follow the true rule of decision in the Supreme Court, as gathered from its several opinions upon the subject, and not to follow expressions in particular opinions, which upon consideration of all appear to be without the court's approval.

What has been said shows it is important to consider the circumstances under which Northern Assurance Co. v. Grand View Building Association was brought before the court, the questions presented for decision, and what was actually decided. It was an action at law upon a fire policy which contained two provisions which need be mentioned: One, that the policy should be void, unless otherwise provided in an indorsement thereon or addition thereto, if the insured then had or should thereafter procure other insurance on the property covered by that policy; and the other, that no agent could waive any provision of the policy, except by a written indorsement thereon or addition thereto. It was shown by oral testimony that there was other concurrent insurance on the property when the policy was issued and that the company's agent was so informed at the time. No consent to other insurance was indorsed on the policy or added to it. A judgment for the plaintiff was affirmed by this court; there being majority and dissenting opinions. 41 C. C. A. 207, 101 Fed. 77. The majority opinion applied the principle of estoppel in pais, and held that the written stipulation respecting other insurance was avoided or superseded by the oral testimony of the agent's knowledge of the existence of such insurance when the policy was issued. It also held that the stipulation limiting the agent's authority was not applicable to his acts at the inception of the contract, but only to such as might occur after the policy should become operative. The dissenting opinion was to the effect that the stipulation invalidating the policy if there was other insurance could not be contradicted or varied by parol, as was permitted by the majority opinion, citing, among others, certain decisions of the Circuit Court of Appeals for the Seventh Circuit, and that the other stipulation was an effectual limitation upon the authority of the agent at the inception of the contract as well as thereafter. Thus, when the case was removed to the Supreme Court by certiorari, two questions were distinctly presented: One whether, notwithstanding the rule which protects written contracts against contradiction or alteration by parol testimony, the act of the agent in issuing the policy with knowledge of the existing insurance could be shown by parol for the purpose of avoiding or superseding the stipulation against other insurance, through the application of the principle of estoppel; and the other, whether the other stipulation was an effectual limitation upon the agent's authority. In its opinion the Supreme Court cites with approval several of the decisions of state courts before mentioned, particularly commends the ruling in the two New Jersey cases that the principle of estoppel cannot be invoked to defeat the rule which prevents the contradiction or alteration of written instruments by parol, and then proceeds:

"It must be conceded that it is shown, in the able brief of the defendant in error, that in several of the states the courts appear to have departed from well-settled doctrines in respect both to the incompetency of parol evidence to alter written contracts and to the binding effect of stipulations in policies restricting the authority of the company's agents. * * * We do not consider it necessary or profitable to examine in detail the decisions of the Circuit Courts or of the Circuit Courts of Appeals. It is sufficient for our present purpose to say that the Circuit Court of Appeals for the Seventh Circuit has held consistently to the doctrines on this subject laid down by the English and American courts generally (United Firemen's Ins. Co. v. Thomas, 82 Fed. 406, 27 C. C. A. 42, 47 L. R. A. 450), and that the Court of Appeals for the Eighth Circuit in the present case has by a majority of its members adopted and applied the view that a written contract may in an action at law be changed by parol evidence, and that such clauses as restrict the power of agents of insurance companies to contract otherwise than by some writing should be given effect, if at all, as they respect such modifications of a policy as are made or are attempted to be made after it has been delivered and taken effect as a valid instrument, and should not be considered as having relation to acts done by the company or its agents at the inception of the contract. 101 Fed. 77, 41 C. C. A. 207. In such divergence of decisions, we have deemed it proper to have the present case brought before us by a writ of certiorari. As to the fundamental rule that written contracts cannot be modified or changed by parol evidence, unless in cases where the contracts are vitiated by fraud or mutual mistake, we deem it sufficient to say that it has been treated by this court as invariable and salutary. The rule itself and the reasons on which it is based are adequately stated in the citations already given from the standard works of Starkie and Greenleaf. Policies of fire insurance in writing have always been held by this court to be within the protection of this rule."

Prior decisions of that court are then reviewed, including Insurance Co. v. Wilkinson, and it is said (pages 361, 364 of 183 U. S., pages 153, 154 of 22 Sup. Ct. [46 L. Ed. 213]):

"What, then, are the principles sustained by the authorities and applicable to the case in hand? They may be briefly stated thus: That contracts in writing, if in unambiguous terms, must be permitted to speak for themselves, and cannot by the courts, at the instance of one of the parties, be altered or contradicted by parol evidence, unless in case of fraud or mutual mistake of facts; that this principle is applicable to cases of insurance contracts as fully as to contracts on other subjects; * * * that it is competent and reasonable for insurance companies to make it matter of condition in their policies that their agents shall not be deemed to have authority to alter or contradict the express terms of the policies as executed and delivered; that where fire insurance policies contain provisions whereby agents may, by writing indorsed upon the policy or by writing attached thereto, express the company's assent to other insurance, such limited grant of authority is the measure of the agent's power in the matter; and where such limitation is expressed in the policy executed and accepted, the insured is presumed, as matter of law, to be aware of such limitation. * * * This case is an illustration of the confusion and uncertainty which would be occasioned by permitting the introduction of parol evidence to modify written contracts and by approving the conduct of agents and persons applying for insurance in disregarding the express limitations put upon the agents by the principal to be affected. It should not escape observation that preserving written contracts from change or alteration by verbal testimony of what took place prior to and at the time the parties put their agreements into that form is for the benefit of both parties. In the present case, if the witnesses on whom the plaintiff relied to prove notice to the agent had died, or had forgotten the circumstances, he would thus, if he had depended to prove his contract by evidence extrinsic to the written instrument, have found himself unable to do so. So, on the other side, if the agent had died, or his memory had failed, the defendant

company might have been at the mercy of unscrupulous and interested witnesses. It is not an answer to say that such difficulties attend other transactions and negotiations; for it is a knowledge of the inconveniences that attend oral evidence that has led to the custom of putting important agreements in writing and to the legal doctrine that protects them, when so expressed and when no fraud or mutual mistake exists, from being changed or modified by the testimony of witnesses as to conversations and negotiations that may never have taken place, or the real nature and meaning of which may have faded from recollection."

Thus the opinion shows that both of the questions presented in the case were deliberately determined by the Supreme Court, after full consideration of its prior decisions and of the conflicting decisions in the state courts; that, in respect of the first question, it was held that, in the absence of fraud or mutual mistake, unambiguous written contracts must be permitted to speak for themselves, and cannot, at the instance of one of the parties, be altered or contradicted by parol testimony; and that the theory that such testimony, although not competent to alter or contradict the contract, may yet be received for the purpose of raising an estoppel in pais, is a mere evasion of the true rule and wholly untenable. While that ruling is determinative of the present cases; there are also decisions of this court which would lead to the same result. Thus, in Laclede Fire Brick Mfg. Co. v. Hartford Steam Boiler Inspection Co., 9 C. C. A. 1, 3, 8, 60 Fed. 351, 353, 358, there was proof that the inspector, through whom a policy was obtained insuring seven boilers against explosion, had stated to the insured, in advance of the issuing of the policy, that if additional boilers were obtained, but not more than seven were used at the same time, the risk would be no greater and the policy would cover the additional boilers: but it was held that there was no liability under the policy for the explosion of an after-acquired boiler and that the inspector's statement "was merged in the written contract evidenced by the policy, and was not available to the plaintiff either as a representation, an agreement or an estoppel." So, also, in Traveller's Ins. Co. v. Henderson, 16 C. C. A. 390, 395, 69 Fed. 762, 768, which was a suit in equity to reform a policy, it was held:

"Where the class of risks intended to be insured against is clearly described in the policy, and the assured has a full and fair opportunity to read the instrument, the company will not be bound by representations made by its agent, in good faith, that the policy covers risks that are not in fact within its provisions."

In other cases it has been often stated that, in the absence of fraud or mutual mistake, no representation, promise, or agreement made, or opinion expressed, in the previous parol negotiations, as to the terms or legal effect of the resulting written contract, can be permitted to prevail, either in law or in equity, over the plain provisions and proper interpretation of the contract. Wilson v. United States Cattle-Ranch Co., 20 C. C. A. 241, 73 Fed. 994; McKinley v. Williams, 20 C. C. A. 312, 74 Fed. 94; Green v. Chicago & N. W. Ry. Co., 35 C. C. A. 68, 92 Fed. 873; Union Selling Co. v. Jones, 63 C. C. A. 224, 128 Fed. 672; Kilby Mfg. Co. v. Hinchman-Renton Fire

141 F.—57

Proofing Co., 66 C. C. A. 67, 132 Fed. 957; Rucker v. Bolles, 67 C. C. A. 30, 34, 133 Fed. 858; Davis Calyx Drill Co. v. Mallory (C. C. A.) 137 Fed. 332.

The decisions cited exhaust the argument upon the subject. Nothing could be added to what they contain. Because of the error in admitting parol testimony which enabled the insured to recover on policies different from those which the parties had made for themselves, and because of the error in refusing to direct verdicts for the defendants upon the evidence properly admitted, the judgments are reversed, with directions to grant a new trial in both cases.