### W. S. GRAY COTTON MILLS *ET AL.* v. SPARTANBURG COUNTY MILLS
### *In re* MASON MACHINE WORKS

(137 S. E., 684)

1. EVIDENCE—AGREEMENT BETWEEN CREDITORS SUING FOR APPOINTMENT OF RECEIVER HELD AMBIGUOUS AS RESPECTING LIENS AND PAROL EVIDENCE ADMISSIBLE TO SHOW SIGNATORIES UNDERSTANDING.— In action for appointment of receiver, written agreement between plaintiff creditors *held* ambiguous in so far as it related to releasing of liens with preferred claimants, to extent warranting admission of testimony as to how the signatory parties understood the agreement.

2. CORPORATIONS—FRAUD OF CREDITOR HELD SUFFICIENTLY ALLEGED TO WARRANT ADMISSION OF PAROL EVIDENCE OF CIRCUMSTANCES UNDER WHICH AGREEMENT BETWEEN CREDITORS SEEKING APPOINTMENT OF RECEIVER WAS EXECUTED.—In creditors' action for appointment of receiver, fraud of particular creditor asserting preferred claim *held* sufficiently pleaded to warrant admission of parol evidence showing circumstances under which agreement between creditors was signed, though not alleged prior to written objections to master's allowance of preference claimed.

3. EVIDENCE—PLEADING OF FRAUD AS AFFECTS ADMISSIBILITY OF PAROL EVIDENCE, AFFECTING WRITTEN CONTRACT, NEED NOT BE DIRECT.—

Fraud warranting admission of parol evidence, affecting written agreement, need not be pleaded in direct terms, but may be charged by stating facts' from which it is necessarily inferred.

4. EVIDENCE—PAROL TESTIMONY IS ADMISSIBLE TO CONTRADICT, VARY, OR EXPLAIN DEED, CHARGED TO HAVE BEEN FRAUDULENTLY OBTAINED.—Where there is a charge of fraud in obtaining a deed of conveyance, parol testimony is admissible to contradict, vary, or explain it.

5. ESTOPPEL—PARTICULAR CREDITOR IN RECEIVERSHIP SUIT HELD ESTOPPEL TO ASSERT PREFERRED CLAIM.—In creditors' suit for appointment of receiver, conduct of particular creditor held to estop him from claiming preferred claim.

6. ESTOPPEL—ELEMENTS OF "ESTOPPEL" ARE FALSE REPRESENTATION OR CONCEALMENT, KNOWLEDGE OF FACTS, ABSENCE OF KNOWLEDGE BY ADVERSE PARTY, INTENT THAT ADVERSE PARTY ACT THEREON, AND RELIANCE AND ACTION BY ADVERSE PARTY TO HIS PREJUDICE.—The elements of "estoppel" are a false representation or concealment of material facts, made with knowledge thereof to one without knowledge or means of knowledge, and with intent that it be acted on, and reliance and action thereon to his prejudice by party to whom representation was made.

Before BONHAM, J., Spartanburg, August, 1923. Affirmed.

Action by the W. S. Gray Cotton Mills and others, creditors, against the Spartanburg County Mills. From a decree denying preference to the claim of the Mason Machine Works Company, claimant appeals.

The decree of Judge Bonham is as follows:

"This action was begun for the purpose of procuring the appointment of a receiver for Spartanburg County Mills, and to wind up its affairs. It was a corporation organized and chartered under the laws of South Carolina for the business of manufacturing cotton goods, with its plant and principal place of business at Spartanburg, S. C. Its charter was issued in 1919, and it organized with John B. Cannon as president. In 1920 the corporation, finding itself in financial difficulties, entered into negotiations with its creditors looking to the adoption of some plan by which the mill might continue to be operated and loss to the cred-

itors averted. These negotiations culminated in March, 1921, in a written agreement between the mills and its creditors, by the terms of which the affairs of the company were placed in the hands of a committee of the stockholders for a period of five years, viz., till March 1, 1926. In turn this committee of stockholders was under the supervision of a committee of the creditors, consisting of Mr. George Norwood, of Norwood National Bank of Greenville; Mr. Fiske, of Fiske-Carter Construction Company; and Mr. Edwin Howard, the Southern Agent of Mason Machine Works. Mr. Wade H. Gray, president of W. S. Gray Cotton Mills of Woodruff, S. C., was selected by these committees to take charge of and operate the Spartanburg County Mills, under and in accordance with the terms of the written agreement. He assumed the management of the mills and operated the concern till April of 1923, when, finding that its condition had not improved, he ceased operating it and shut it down about the last of March or first of April. In August, 1923, the summons and complaint in the present action were served, and in the fall of that year George Norwood and B. C. Fiske were appointed receivers, and are now engaged in the duties of their office.

"By the order of the Court of Common Pleas for Spartanburg County it was referred to Le Roy Moore, Esq., Master for said county, to take the testimony, consider, and pass upon all the claims presented against the Spartanburg County Mills, and report to the Court upon the amounts, the validity, and the priorities of said claims. He has filed his report, and the matter comes on to be heard by me on exceptions to that report on behalf of Mason Machine Works, which claimed a preference for its debt on the ground that it had a contract of sale with Spartanburg County Mills for machinery sold to it, which contract reserves title in the vendor. The Master found and reported against the validity of this claim of preference or priority.

At the reference to prove claims the receivers· and certain of the creditors objected to the allowance of this claim as a preference and filed with the Master the written grounds of their objections. These objections are, mainly: (1) That Mason Machine Works did not file with W. H. Gray claim of lien, and the paper on which it was based, as provided by paragraph 3 of the agreement; (2) that it was the understanding of the parties to the agreement that all liens were removed; (3) that the contract of Mason Machine Works with Spartanburg County Mills dated October 11, 1919, was not recorded till April 23, 1923, and was unknown to the other creditors; (4) that the agreement of the creditors (par. 8) was intended to protect creditors who had a lien till they filed their claim of lien with W. H. Gray; (5) that to allow the preference now claimed by Mason Machine Works would be a fraud on the rights of the other creditors.

"No objection is made to the amount of the claim, or to the proof thereof, nor to its validity; the sole objection is to the claim of preference.

"The contract of sale reserving title was signed by Spartanburg County Mills, by John B. Cannon, president, and by Mason Machine Works, by Edwin Howard, Southern Agent. No one signed as witness of the signature of the contracting parties.

"April 23, 1923, acknowledgment in writing was procured of two witnesses to the execution of the contract, their probates made, and that day the contract was recorded in the office of the Register of Mesne Conveyance for Spartanburg County.

"The exceptions to the Masters report are numerous, but the issues are few.

"The Master, referring to the claim of Mason Machine Works, says this: 'This creditor claims, and not without some merit, that under the proviso of Section 5312 of the Civil Code of 1922, the Registry Statute, as amended in

1914, their contract affects all creditors of Spartanburg County Mills the same as if this contract had not existed prior to the date of recording, but had been executed, delivered, and recorded on that date, and that the recording of their contract confers a lien as against all creditors who did not already have liens on the date of its record.' That statement is in accord with the doctrine laid down in the luminous opinion of Mr. Justice Cothran (concurred in by the majority of the Supreme Court) in the case of *Carroll v. Cash Mills,* 125 S. C., 332; 118 S. E., 290, which opinion was filed April 12, 1923. The Master was bound by the ruling in that case to find in favor of the claim of preference by Mason Machine Works, unless he found that this creditor had waived its lien or estopped itself to claim it. And he did so find, and the exceptions to his report deal with this finding.

"It is excepted that the Master erred in admitting, over the objection of attorneys for Mason Machine Works, the testimony of various persons relating to the negotiations leading up to the creditors' agreement of March 25, 1921, which testimony was offered to show that it was discussed and was understood, and the agreement was signed in the light of such understanding, that all liens were to be removed. It is objected to on the ground that there is no ambiguity in the terms of the contract which needs the aid of parol testimony to make it clear. That the testimony offered varies and alters the terms of the written instrument. That if it does not so vary and alter them it is relevant. That fraud was not pleaded, or, if pleaded, it was not pleaded with sufficient detail as to the facts on which the charge of fraud is predicated.

"Let us review the terms of the written agreement between the Spartanburg County Mills and its creditors.

"The preamble states that the purpose of the agreement is to inaugurate a plan by which the business of the company may be made profitable, its assets saved, and its cred-

itors paid in full. If a majority of the stockholders approve the plan, a great majority of the stockholders shall transfer their stock to a committee of stockholders for a period of five years, viz., to March 1, 1926.

"Paragraph 1 provides that at least 90 per cent. of the undisputed creditors in amount shall sign the agreement, and it must be ratified by a majority vote of the stockholders.

"Paragraph 2 sets forth scope of the duties of the committee.

"Paragraph 3 is as follows: 'Upon the execution of this agreement, each creditor shall forward to W. H. Gray, at Woodruff, S. C., a statement showing the items of its claim and if any lien is claimed a copy of the paper constituting the basis of such claim.'

"Paragraph 4 provides that creditors shall extend the time of the payment of their claims for a maximum period of five years, but also provides for earlier payment if possible, and for the giving of the notes of the company to each creditor for the admitted amount of its claim; for the time and method of the payment of said notes, and for their renewal if necessary.

"Paragraph 5 makes provision for raising a commercial fund to be employed in promoting and conducting the business of the company, which fund shall not exceed $75,000, to be evidenced by the notes of the company, to the payment of which indebtedness the creditors subordinate their claims.

"Paragraph 6. By this paragraph the company agrees that by no act or deed will it suffer or cause any mortgage or other lien to be placed on any part of its plant or machinery so long as any indebtedness shall be due to any of the signatory creditors.

"Paragraph 8 is in the following language: 'It is agreed that any creditor executing this agreement shall not be understood as waiving or releasing any lien which it may

have upon any property of the company, but the execution of this contract and the acceptance of the notes herein provided shall be without prejudice to any such lien, and that the lien, if any, shall be preserved as though this agreement had not been executed by such creditor.'

"Paragraphs 9 and 10 relate to routine matters which are not involved in this controversy.

"I have reproduced in full paragraphs 3 and 8, because it is around their terms and language the settlement of the question of ambiguity centers.

"I think it may be taken as granted that the language of each paragraph is plain, and, in itself, presents no element of doubtful construction, which requires the aid of parol testimony to make it plain. The application of the provisions of the two paragraphs may create a condition of uncertainty which would require extrinsic aid for its interpretation. The question arises whether it was intended by the provision of paragraph 3 that the creditor intending to claim a lien should file his claim itemized, and the paper on which he based his claim for a lien, with Mr. Gray at Woodruff, S. C., as a condition precedent to his claim of a lien. What was the effect of a failure to file such paper?

"The paragraphs 3 and 8, taken in conjunction, may well create a state of uncertainty as to their meaning. Indeed, they did create such uncertainty. Mr. Cox, representing Mason Machine Works, and who had the proposed agreement in his hands for study, and for his signature, was evidently in doubt as to the meaning of the terms of the agreement in this regard for he, having signed the agreement for Mason Machine Works, writes his Southern agent, Mr. Howard, as follows: 'Builders, machinery makers, bankers, and supply creditors were to have no preference one over the other, and before we will allow you to deliver the signed copy of the agreement it must be understood that the mechanic or workman's lien is to be re-

moved, as it would be unfair to all the rest of the creditors to allow this lien to remain, and then if disaster overtook Mr. Gray's efforts to find that the Fiske-Carter people had this old lien on record.' It is evident that a condition of ambiguity existed in the mind of Mr. Cox growing out of the language of the agreement. He brought about by his letter to Mr. Howerd a state of uncertainty of the meaning of the terms of the agreement. I think it was proper to admit testimony to show how the signatory parties understood these terms of the agreement. Such testimony did not alter and vary the terms of the written agreement; it amounted to saying that the provisions of the agreement for preservation of liens were not altered, but that they were waived as an inducement to the signing of the contract by all parties. They understood that such as had liens would retain them, as protection against outsiders, but as against the signatories of the agreement they would not claim them.

"Mr. Justice Cothran, delivering the opinion of the Court in *Hastings v. Union Fire Insurance Company,* 130 S. C., 326; 125 S. E., 923, said: 'The policy was unambiguous upon its face, that is, it displayed no patent ambiguity, but it does not at all follow that extrinsic circumstances may not develop a latent ambiguity.' In *Jennings v. Talbert,* 77 S. C., 454; 58 S. E., 420, it is said 'Ambiguities, however, are patent and latent, the distinction being that * * * the uncertainty is one which arises upon the words of the will, deed or other instrument as looked at in themselves, and before any attempt is made to apply them to the object which they describe, while in the latter case the uncertainty arises, not upon the words of the will, deed or other instrument as looked at in themselves, but upon those words when applied to the object or subject which they describe.' The opinion quotes further from 2 C. J., 1314, speaking of latent ambiguities, as follows: 'It does not appear on the face of the words used, nor is its exist-

ence known until those words are brought into contact with collateral facts.'

"The objecting creditors charge that it would be a fraud upon the rights of themselves and the other creditors to permit Mason Machine Works now to claim a preference for its debt. In other words, they say: Mason Machine Works concealed knowledge of its contract, with reservation of title; did not record it; made no claim of a lien throughout the negotiations for the creditors' agreement; insisted in the letter to Howard, as a condition precedent to the delivery of the written contract that all liens of 'builders, machinery workers, bankers, and supply creditors' must be removed; that this conduct amounts to fraud if this creditor intended to claim, as it does now claim, a preference. But it is urged in argument that the objecting creditors have not properly pleaded fraud, and in their objections have not sufficiently specified the acts of fraud charged. It must be borne in mind that this is not an action by the objecting creditors against Mason Machine Works. They are joint plaintiffs against Spartanburg County Mills. They had no notice that Mason Machine Works would claim any preference till they came before the Master to prove their debts. When the claim of preference was made by the Mason Machine Works, they filed these written objections including the charge of fraud. I do not see how they could have done so sooner, or any other way; and I think fraud is alleged with sufficient definiteness. It was competent, then, to admit evidence to show that the agreement was signed under circumstances other than those which appear on its face, and with an understanding more than is apparent from the language of the instrument itself.

" 'It is not necessary that the pleading allege fraud in direct terms; the charge may be sufficiently made by stating facts from which fraud is necessarily implied.' *Donaldson v. Temple*, 96 S. C., 241; 80 S. E., 438.

" 'Where a paper is offered in evidence, any party may

attack it for fraud and misrepresentation without having pleaded it, and in a law case as well as in an equity case.'

"In the first place, even in a law case, the Court has a right, when an instrument of writing is introduced in evidence, although it was not mentioned in the pleadings, to declare it null and void, in so far as that action is concerned. In the second place, the testimony was admissible for the reason that misrepresentation and deceit are elements of fraud.' *Charleston & W. C. Railway Co. v. Devlin,* 85 S. C., 131; 67 S. E., 150, citing *McKenzie v. Sifford,* 45 S. C., 496; 23 S. E., 622. *Baldwin v. Cable Co.,* 78 S. C., 419; 59 S. E., 67, and *Brown v. Tel. Co.,* 82 S. C., 173; 63 S. E., 744.

" 'Where there is a charge of fraud in obtaining a deed of conveyance, parol testimony is admissible to contradict, vary, or explain it.' *Willcox v. Priester,* 68 S. C., 110; 46 S. E., 555, citing *Lee v. Lee,* 11 Rich. Eq., 582.

" 'So far as the testimony related to the true consideration of the deed and the manner in which it was to be paid, it did not violate the rule which excludes parol testimony to contradict a written instrument.' *Willcox v. Priester, supra,* citing *Curry v. Lyles,* 2 Hill, 404. *Calvert v. Nickles,* 26 S. C., 310; 2 S. E., 116.

" 'In a case of fraud, the rules of evidence making the writing conclusive evidence as to the terms of a contract are not stictly applied.' *Parham v. Atlantic Life Insurance Co.,* 104 S. C., 223; 88 S. E., 470.

"Does the testimony to which Mason Machine Works objected show waiver or estoppel? Following is a résumé of the evidence so objected to, as it relates to this phase:

"J. A. Leathers, one of the objecting creditors, states that he was present at the creditors' meeting at which the creditors' agreement was discussed, and the personnel of the creditors' committee agreed upon; that Mr. Howard, the

southern agent of Mason Machine Works, was present at this meeting and was made a member of the creditors' committee. He was apparently acting for his company. That no mention was made by Mr. Howard on behalf of his company that it had a lien, or that it would claim a preference. Witness is strongly of the opinion that he would not have signed the agreement if he had known of such claim of preference. He knew about the amount of Mason Machine Works debt and that it was for machinery, but did not know of a title reserving contract.

"C. P. Matthews, another creditor, testified that he is a partner of J. A. Leathers; that he would never have consented for Leathers to sign the creditors' agreement if he had known that the Mason Machine Works claimed a preference. He never saw the contract with Mason Machine Works and had no information that they had a title retention contract. There had been no lien recorded.

"It was admitted that if Charles L. O'Neale were present he would testify that he would not have signed the agreement if he had known that Mason Machine Works claimed a preference.

"George Norwood testified as follows: 'Is a banker at Greenville, S. C.; is a member of the creditors' committee; the other members are Mr. Howard of the Mason Machine Works, and Mr. Fiske of the Fiske-Carter Construction Company. Mr. Howard met with the committee at frequent intervals and never intimated that his company claimed any preference. Mr. Cox, who is treasurer of Mason Machine Works, met with the committee on one occasion, and asked me for the amounts and names of the preferred creditors. I gave these amounts and names to Mr. Cox, and, of course, did not include the Mason Machine Company. Mr. Cox then asked about what percentage on the claims of the unsecured creditors might be expected. Mr. Cox made no objection to my leaving the name of Mason Machine Works off of the list of preferred claims.

Since the Mason Machine Company recorded their lien in Spartanburg County, Mr. Howard has stated to me that this was the first intimation he had that Mason Machine Works expected to claim a preference. Mr. Howard is the southern agent for the Mason Machine Works and has occupied that position for at least ten years. I attended all of the meetings of the creditors of Spartanburg Mills, and so did Mr. Howard. Mr. Cox was present at at least one of them. The only lien on the property that was regarded as preferred by the committee was that of J. E. Sirrine & Co., which amounted to approximately $5,000.'

"J. A. Leathers, recalled. 'At the time I sold this cotton to Spartanburg County Mills, I had no notice nor knowledge of any lien claimed or that might be claimed by Mason Machine Works on the machinery of the mill. I did not examine the records to see if a mortgage was filed. I was and am a subscriber to the Bradstreet service, which furnishes me reports of the recording of mortgages and liens against concerns with which I do business. I did not receive from them a report showing the recording of this lien or mortgage by Mason Machine Works against Spartanburg County Mills.'

"The letter from Mr. Cox to Mr. Howard, southern agent of Mason Machine Works, quoted by Mr. Howard in his letter to Mr. Gray, has been hereinabove set forth.

"As against this testimony, Mason Machine Works offered the evidence of Thos. G. Cox. Following is an abstract of his testimony in so far as it relates to this question of preference: 'Am treasurer of Mason Machine Works. Mr. Cannon, then president of Spartanburg County Mills, wired to our office for an engagement to be made with Mr. Gray and himself. They came to Boston, accompanied by Mr. Brennon and Mr. Fiske. They asked me to arrange for Mr. Parker, of the Parker Spool & Bobbin Company, to be present. We discussed thoroughly the mills financial condition and its inability to pay its creditors.

They presented a copy of the proposed agreement which the creditors were asked to sign. Mr. Parker gave as his reason for refusing to sign the agreement that Mason Machine Works with its contract containing its right of title lien on this machinery would have an advantage over him where the materials he had furnished could not be distinguished from materials of a similar kind. Parker's company did not have a lien. The question was thoroughly discussed with Mr. Gray, Mr. Cannon, Mr. Parker, and myself. Mr. Parker absolutely refused to sign the agreement. Couldn't swear that anything was then said about Mason Machine Works lien, but to the best of my knowledge there was. The priority of our lien was thoroughly discussed. Mr. Cannon, president of the mill, knew we had a lien. He had a copy of the contract with him. It was examined by Mr. Parker, looked at by myself, Mr. Gray, Mr. Cannon and Mr. Fiske. No effort was made at that conference to induce me to give up the lien which we had on the machinery. I never at any time agreed to give up the lien. Never told any one I would give it up. My purpose in signing the agreement was because the mill was in financial difficulties. Mr. Cannon could carry it no farther. I had known Mr. Gray as a successful mill man, and felt that with normal conditions he was the best man we could get. We had seen the letter Mr. Gray had sent to the creditors and saw no objection to it. If he was given full control, we were willing to go into the agreement. We had no desire to embarrass the Spartanburg County Mills by enforcing our lien, if, under new management, the mills could be worked out of its difficulties. We never entertained 'the thought and it was never presented to us as a precedent to signing the agreement that we would waive or in any way injure our rights of title to that machinery. We were willing, for the length of time the agreement was to run, to let our claim set in the background. So long as Mr. Gray was in charge of the property and the creditors'

committee was functioning that the matter of the lien be left in abeyance. When the creditors' committee and Mr. Gray abandoned the property and it was not operated, it was time for us to assert our rights, and we did so. When we put our mortgage on record, my recollection is the mill was closed. Mr. Gray was still, possibly, president, and the committee in existence, but were not functioning; the property was practically abandoned. It was not our in tention to seek to enforce the lien during the time the creditors' agreement was carried out. The notes were sent us by Mr. Gray after he took charge under the creditors' agreement.'

"On cross-examination he said:

" 'The date of our contract was October 11, 1919. It was recorded real estate May 15, 1923, chattel mort-gage April 23, 1923. That was after the Cash Mills decision. Absolutely, that was not what determined me to record that paper. I remember writing a letter to Mr. George Norwood, April 26, 1923, in regard to Spartanburg County Mills proposition, in which I stated: "A hardly contested case in the Courts of South Carolina in the matter of Cash Mills Receivership, Gaffney, S. C., has just been decided by the Supreme Court of South Car-olina in favor of the retention of the title of the machinery that the Saco-Lowell Shops delivered to the Cash Mills at Gaffney, S. C. We construe this decision as placing us in the preferred creditor class." I think you will find there is a paragraph in that letter in which I say to Mr. Norwood that at no time have we considered ourselves other than acting within our rights to record that lien. I don't re-member stating that the only condition on which I would sign the creditors' agreement was that all liens would be renounced by creditors. I understood that Mr. Fiske had a mechanic's lien for building the mill.'

"In answer to the question, 'You insisted that Mr. Fiske surrender his lien on condition of your signing the agree-

ment?' he answered, 'I don't think our objection was directed against the Fiske-Carter Company, but more against a lien claimed, as we were informed, or recorded by Mr. Sirrine.' The information that came to us at the time was not that Fiske-Carter had actually recorded a lien, but that they were entitled to one. We would never have signed the creditors' agreement as long as anybody had any lien or claim on that property that could give them a preference over our lien.

" 'Q. You stated in your letter that a condition precedent to your signing the creditors' agreement was that all liens, mechanics' liens, machinery claims, and all would be waived? A. Certainly not machinery claims.

" 'Q. I show you a letter dated March 19th, addressed to Mr. Gray and signed by Edwin Howard, southern agent, quoting from a letter from you to him. Is that a correct quotation? A. Presumably.

" 'Q. Do you deny that is your statement? A. No, sir.

" 'Q. Is it correct? A. I think undoubtedly it is.

" 'I meant by that letter that we would want all creditors to be placed on an equal basis, if they had a title that had been recorded they must remove it. Creditors who had an unrecorded lien must enter the five-year agreement in the spirit we had entered it, subordinate lien for the term of the agreement. Witness does not recall the conversation to which Mr. Norwood testified, but does not deny it if Mr. Norwood says it occurred.'

"No other parol testimony was offered by Mason Machine Company. It is significant that they did not call Mr. Edwin Howard, their southern agent, who represented them in all these transactions and was a member of the creditors' committee, and who conducted, in part, the negotiations which culminated in the creditors' agreement.

"There was offered in reply the testimony of Mr. J. B. Cannon and Mr. B. C. Fiske.

"Mr. Cannon testified: 'Was president of Spartanburg County Mills. Went to Boston with Mr. Gray. The conference was held at Boston in the office of Mason Machine Works and at the Parker house. We went there to meet Mr. Cox of Mason Machine Works and Mr. Parker of Parker Spool & Bobbin Company, to get them to sign the creditors' agreement, by which Mr. Gray was to borrow $75,000 to run the mill. Mr. Norwood wouldn't lend this money unless all creditors carried their accounts five years and that the $75,000 furnished be preferred against all other claims. Mr. Cox, in the course of the conversation, never mentioned his lien on any machinery.'

"Cross-examination: 'I did not have his contract with me in Boston. I left copy of contract in the mill when I left there. I knew they had a contract. I was familiar with the terms of it when I went to Boston. Mr. Cox did not claim a lien then; it was not mentioned.'

"Redirect examination: 'Mr. Fiske, of Fiske-Carter Construction Company, was at the conference in Boston. The question of renouncing his lien was not entered into at all. I never had any conversation at all with Mr. Cox in regard to whether, or not he claimed a lien. He never, to me, claimed a lien. In April, 1923, Mr. Howard came to my office and said that the original agreement between Spartanburg County Mills and Mason Machine Works had not been witnessed and probated, and asked if I would do it, which I did. At the conference in Boston I fully explained to Mr. Cox that I wanted to put all the creditors on the same basis for five years.'

"Mr. Fiske testified: 'I was one of the creditors' committee under the agreement. I never heard any one connected with the Mason Machine Works say that they expected to enforce a lien, or had a lien, or talk about it whatever until the spring of 1923, after the Cash Mills suit. I was present at the conference in Boston. There were present Mr. W. H. Gray, Mr. Cannon, Mr. Parker of the Parker

Spool & Bobbin Company, Mr. Cox, and, if I remember correctly, Mr. R. M. Brennon, of New York, and myself. Mr. Cox did not make any claim of any lien. It was not mentioned. Our committee, consisting of Mr. Norwood, Mr. Howard, and myself, had frequent meetings. Mr. Howard never mentioned any claim by his company of a lien. When the agreement was drafted it was understood, after discussing the claims, that the signing of that instrument would put every one on an equal footing, that there would be no liens enforced. That was at the meeting in Mr. Haynsworth's office at Greenville, when the creditors' agreement was drawn up. It was found that J. E. Sirrine & Co. had already filed a mechanic's lien on the property, and some little time before that Alexander & Vassey had brought a court action on a disputed bill for machinery furnished to the mill. Mr. Sirrine declined to withdraw his lien which was already filed, but was willing to abide by whatever agreement was made by the other creditors, and it was not his intention to enforce the lien at that time. In fact, he never has done so. The Fiske-Carter claim of lien was objected to, and I withdrew whatever claims we had to right of lien, with the understanding that all creditors would be on an equal footing after the agreement was signed. Mr. Howard was present. I took no steps after that to perfect a mechanic's lien. I never heard that Mason Machine Works considered that they had a right to a lien after signing that agreement, or that they proposed to do so until after the decision in the Cash Mills case.'

"Cross-examination: 'I knew that Mason Machine Works had a contract reserving title to this machinery. I knew it when I signed the agreement. I don't think Sirrine & Co. signed the agreement, if they had the lien would have been withdrawn.'

" 'Q. So if the understanding was that all creditors would be put on an equal footing it was not done? A. Not in that particular case.'

"Mr. Sirrine never signed the agreement and his lien was recorded before we had the meeting at which the agreement was drawn up. The mill was idle May 15, 1923, when the contract was recorded. Had been shut down since about March 1, 1923. I knew that having a mechanic's lien on record I had to bring suit in six months to enforce it.'

"Redirect examination: 'I would never have signed the agreement for Fiske-Carter Construction Company if it had not been for the understanding that all liens would be released. The matter of liens of individual creditors, to the best of my recollection, was not mentioned the day the agreement was drawn up, but it was the general understanding that no liens were to be enforced. Even Mr. Sirrine said he would not enforce his.'

"The attorneys for Mason Machine Works objected to most of this testimony on the grounds already considered.

"Is Mason Machine Works estopped to set up its lien? It seems to me that the great weight of the evidence supports the view that all the creditors entered into the agreement with the understanding that no liens would be enforced. This was the inducing motive to the signing of the agreement. Mason Machine Works, by Mr. Howard, participated in these discussions preceding the drafting and signing of the agreement and must have been cognizant of the fact that that was the understanding. Yet he never at any time before or after the signing of the agreement said that his company would assert its claim of lien. He remained silent and thereby induced the others to act on the understanding that his company would not enforce its lien. During the two years of operation of the mill under the creditors' agreement he was on the creditors' committee which controlled its operations, he never intimated such a claim for his company. He said after the lien was recorded in April, 1923, that that was the first intimation he had that his company intended to claim it. The clear preponderance of the evidence shows that at the conference in

Boston, Mr. Cox did not assert the right of his company to a lien. That after the agreement was signed he was shown, at his request, by Mr. Norwood, of the creditors' committee, a list of those creditors claiming a preference and his company's claim was not in it, yet he made no comment thereon and made no claim of a lien. On the contrary, he showed an interest in ascertaining what per cent. of their claims the unsecured creditors might expect to receive. It filed an itemized statement of its claim with Mr. W. H. Gray, as required by paragraph 3 of the creditors' agreement. And although that same paragraph provides that any creditor, claiming a lien, must, when filing its claim, also file with Mr. Gray a copy of the paper on which the claim of lien is based, it did not file any claim of lien. It seeks to explain this by saying that a copy of its contract retaining title with Spartanburg County Mills had been left with the mill when executed in February, 1919, and was there. It was there when Mr. Cannon was president and left there by him when he retired. There is no particle of evidence that Mr. Gray ever saw it or ever knew it. Mr. Gray died in the fall of 1923.

"Again, the letter to Mr. Howard, southern representative of Mason Machine Works, which was quoted in Mr. Howard's letter to Mr. Gray, appears to me to be conclusive evidence that Mr. Cox understood as did all the creditors that the condition precedent to signing the creditors' agreement was that all builders, machinery makers, bankers, and supply creditors should waive their liens and be put on an equal footing. He says so. It is pertinent to reproduce his language: 'Builders, machinery makers, bankers, and supply creditors were to have no preference one over the other, and before we will allow you to deliver the signed copy of the agreement it must be understood that this mechanic's or workman's lien must be removed, as it would be unfair to all the rest of the creditors to allow this lien to remain, and then if disaster

overtook Mr. Gray's efforts to find that the Fiske-Carter people had this old lien on record.' It is argued that there is no evidence that any of the creditors ever saw this letter. Mr. Howard, a member of the creditors' committee, was forbidden to deliver the signed agreement until assured that it was understood that the mechanic's lien was removed and that 'builders, machinery men, bankers, and supply creditors were to have no preference one over the other'; he did deliver it. It is a legitimate inference that he satisfied himself, or already knew, that that was the understanding of all the signatory parties to the agreement.

"The elements of estoppel are: A false representation, or the concealment of material facts; it must have been made with knowledge of the facts; the party to whom it was made must have been without knowledge or means of knowledge of the real facts; it must have been made with the intention that it be acted upon; and the party to whom it was made must have relied on, or acted on it to his prejudice.

"It is patent to my mind that all the elements of estoppel prevail in this transaction. The contract retaining title with Spartanburg County Mills was made in October, 1919, and had not been recorded in March, 1921, when negotiations culminated in the creditors' agreement. Mason Machine Works concealed the fact of the existence of such contract, from some of the creditors, and concealed from all of them its purpose to enforce the contract. By its silence and its conduct it induced the other creditors to believe that it would not assert or claim a lien, or preference; it intended that the creditors should act on that understanding; they did act on it to their prejudice. All of them forbore the enforcement or prosecution of their claims, while the property and the assets of the mills were lost in a vain effort to pay all the debts. Fiske-Carter Construction Company lost the oppor-

tunity to file and enforce its mechanic's lien for the construction of the mill.

"My analysis of the matter is this: When the negotiations were in progress which eventuated in the creditors' agreement, Mason Machine Works did not realize that they had a preference over the creditors (unsecured), who had become such after the signing by the Spartanburg Mills of the contract with Mason Machine Works, in which the title to the property sold was reserved. That contract had not been recorded. In fact, it was not in shape to be recorded; there were no witnesses to the signatures of the parties to it. It could not be probated, and hence could not be recorded. At that time it was the commonly accepted construction of the law that, if the holder of a mortgage or lien did not record it within the time prescribed by the recording statutes, subsequent creditors without notice, who became such before its recording, were on an equal footing with the holder of the paper. Thinking thus, Mason Machine Works desired and insisted that it be understood that all liens were removed. Mr. Cox's letter to Mr. Howard is irrefutable evidence of this. Thereafter, and coincident with the shutting down of the Spartanburg Mills by Mr. Gray—the operating of it under the creditors' agreement having failed—the Supreme Court of South Carolina filed its opinion in the case of *Carroll v. Cash Mills*. To this action Mason Machine Works was a party, and, along with Saco-Lowell Shops, had asserted the construction of the registry statute which the Supreme Court upheld, to the effect that such contract retaining title, as is here in issue, took effect as of the date of its recording, and took precedence over creditors who became such after its date and before its recording, unless they had obtained liens. Mason Machine Works, being a party to the action, were early apprised of the filing of the opinion in *Carroll v. Cash Mills*, and its import, and then was born the idea of setting up the preference of the lien against Spartanburg County

Mills. The Carroll-Cash Mills opinion was filed April 12, 1923, the contract with Spartanburg County Mills was procured to be witnessed April 23, 1923, and recorded that day, more than three years after it was executed. It was an afterthought to claim a lien—an afterthought suggested by the result of the Carroll-Cash case. It would be inequitable to permit it to be carried out. As Mr. Cox said in his letter to Mr. Howard: 'It would be unfair to all the rest of the creditors to allow this lien to remain, and then if disaster overtook Mr. Gray's efforts to find that the Fiske-Carter Company (substitute Mason Machine Works) had this old lien on record.' As is said in the leading opinion in the case of *Carroll v. Cash Mills,* "The whole purpose of the recording acts is to prevent secret liens, to protect *bona fide* purchasers for value and subsequent creditors, who have relied on the apparent possession of the vendee, to purchase from him or to extend credit to him. When the vendor has thus led the purchaser or subsequent creditor to rely on the apparent title of the vendee he is estopped from setting up his title in derogation of their rights. He still has the title, but, as against these classes of persons who have been misled by his conduct, * * * he should not be allowed to show title.' This salutary rule was denied the unsecured creditors in *Carroll v. Cash Mills* because it appeared that the machinery upon which a lien was claimed had never been installed in the mill when the unsecured debts were made—and hence the machinery could not have been an inducement to extend credit to the Cash Mills. In the present case, the machinery was installed and the mill was in operation when the credits were extended—in some cases for cotton to run the mill.

"I cannot give my consent to the doctrine that Mason Machine Works can in good faith and equity, in the circumstances surrounding this entire transaction, set up its claim of a lien in preference to the unsecured creditors. I think the Master's report is correct as to the claim of lien under the

contract retaining title as well as on the claim for $745 for goods sold to the mills which were operated by Mr. Gray.

"It is, therefore, ordered, adjudged, and decreed, that the exceptions to the Master's report be, and the same are, overruled, and the report is confirmed and made the judgment of the Court.

"Any of the parties to the action may apply at the foot of this decree for such further order or orders as may be necessary to carry it into effect."

*Messrs. Martin & Blythe,* for appellant, cite: *No penalty for failure of holder of chattel mortgage, or contract reserving title, to record such instrument, if recorded before receivership or bankruptcy:* 125 S. C., 332. *Extrinsic evidence not admissible to control or vary terms of written agreement:* 22 C. J., 1220; Id., 1177, 1179; 10 R. C. L., Sec. 208; 69 S. C., 99–101; 24 S. C., 129; 87 S. C., 69; 46 S. C., 229. *Same; to raise estoppel:* 141 Fed., 877; 4 L. R. A. (N. S.), 758; 10 R. C. L., 1017. *Same; subject to limitations, only where latent ambiguity:* 111 S. C., 512; 119 S. C., 340; 134 S. E., 257. *Admissibility of evidence necessary to establish fraud:* 78 S. C., 486; 58 S. C., 59. *Necessary to plead waiver whether sought to be raised by complaint or by answer:* 69 S. C., 300. *Can waive known rights only:* 21 C. J., 1166–7; 26 S. C., 186; 67 S. C., 453–4. *Voluntary act:* 40 Cyc., 259. *Must be intentional:* Id., 261. *"Waiver":* Id., 256–7. *Consideration necessary for estoppel to support such claim of waiver:* 27 R. C. L., 910; 40 Cyc., 263–4; 13 S. C., 87–90. *Antecedent parol evidence inadmissible on waiver except as the claim of waiver is based on allegations of fraud:* 22 C. J., 1098–1104; 82 Fed., 408; 27 C. C. A., 42; 47 L. R. A., 454; 104 U. S., 252–59; 26 L. Ed., 165, 168; 22 C. J., 1220. *Where contract susceptible of two constructions, one of which will work a forfeiture and the other will not, construction adopted which prevents forfeiture:* 13 C. J., 541, Section 512. *Forfeiture only where language sus-*

*ceptible to but one meaning:* 84 S. C., 213. *Fraud to estoppel must be affirmatively proved:* 27 C. J., 44–5; 45 S. C., 496–503. *Essential elements of estoppel:* 21 C. J., 1119; Pom. Eq. Juris., 805; 97 S. C., 116–129; 42 S. C., 348; 21 C. J., 1126; 26 S. C., 179–186; 67 S. C., 453–4; 10 R. C .L., 693. *Mistake of law will not prevent reformation of a deed:* 44 S. C., 22, 31–33; 21 S. C., 976; 48 S. C., 341; 49 S. C., 277; 85 S. C., 472; 112 S. C., 320; 106 S. C., 346; 92 S. C., 305; 94 S. C., 349; 115 S. C., 452. *Doctrine of estoppel by representation not applicable to promises concerning the future:* 124 S. C., 8; 21 C. J., 1142; 62 S. C., 390. *Vigilance prerequisite maxim of equity:* Pom. Eq. Juris. (3d Ed.), Sec. 813. *One setting up estoppel must show he has been misled to own injury:* 96 S. C., 106. *Mere silence not sufficient:* 10 R. C. L., 692–3; 124 S. C., 489; 114 S. C., 491. *Fraudulent intent necessary:* Pom. Eq. Juris., Sec. 883.

*Messrs. Bomar & Osborne; Nicholls, Wyche & Byrnes; Perrin & Tinsley; and Thomas B. Butler, Jr.,* for respondents, cite: *Intention of parties to contract gathered from contract as a whole:* 13 C. J., 525; 102 S. C., 227. *Intention necessary to construe contract:* 84 S. C., 148. *Parol testimony admissible to clear up latent ambiguity:* 130 S. C., 326; 77 S. C., 454; 2 C. J., 1314; 93 S. C., 406. *Same; to show intention of parties to contract:* 13 C. J., 542; 88 S. E., 878, 882; 107 U. S., 441; 27 L. Ed., 531; 61 S. E., 185; 23 L. R. A. (N. S.), 223; 125 A. S. R., 550; 15 Ann. Cas., 363; 85 S. E., 381; 83 S. E., 471. *Same; to show inducing cause for signing of contract:* 22 C. J., 1212, 1182, 1253. *Same; where necessary to defeat fraud:* 51 Am. Dec., 540; 137 Pac., 981; L. R. A., 1915-C, 177; 10 R. C. L., 1017; 218 Pac., 986; 127 S. E., 208; 110 S. E., 402. *Paper introduced in evidence may be attacked on ground of fraud; issue sufficiently raised to allow testimony:* 96 S. C., 241; 85 S. C., 131; Id., 130; 78 S. C., 419; 82 S. C., 173; 67 S. C., 110; 11 Rich. Eq., 582; 2 Hill, 403;

26 S. C., 210; 51 Am. Dec., 540; 22 C. J., 1212, 1182, 1253. *Silence is fraud where duty to speak:* 9 Rich. L., 300. *Deeds and acts may constitute fraud:* 1 Strob., 220. *Fraud is state of mind provable by circumstantial evidence:* 104 S. C., 223; 102 S. C., 317; 26 S. C., 275; 103 S. C., 391; 92 S. C., 384.

March 8, 1927.

The opinion of the Court was delivered by MR. ACTING ASSOCIATE JUSTICE C. J. RAMAGE.

We are entirely satisfied with the decree of his Honor, Judge M. L. Bonham. Let the decree be reported. Therefore, for the reasons stated by his Honor in the circuit decree, it is the judgment of this Court that the judgment of the Circuit Court be affirmed.

MESSRS. JUSTICES BLEASE and STABLER concur.

MR. CHIEF JUSTICE WATTS dissents.

MR. JUSTICE COTHRAN (dissenting): This is an appeal from a decree of his Honor, Judge Bonham, confirming the report of the Master, which denied to the claimant, Mason Machine Works Company, priority of its claim over the unsecured creditors of the Spartanburg County Mills. (For convenience I shall refer to the Mason Machine Works Company as the "Mason Company," and to the Spartanburg County Mills, as the "mill.")

The main action was commenced in the Court of Common Pleas for Spartanburg County on August 23, 1923, by the plaintiff and other creditors of the mill, for the appointment of a receiver for the liquidation of its affairs as an insolvent corporation.

By order of the Court, a receiver was appointed, and the case was referred to Le Roy Moore, Esq., as Special Master, to take the testimony and report upon the validity, amounts, and priorities of claims filed. In compliance with the order, notice was published calling in creditors, and references were held upon the claims presented. No objection was

interposed to any of the claims filed, except to that of the Mason Company, and no objection was interposed to its amount, validity, or proof; the objection going solely to its claim of priority over unsecured creditors. The Master denied the priority; the Circuit Judge confirmed the Master's report; and the appeal is here from his decree involving the single question indicated.

The claim of the Mason Company and its contention that it has priority over unsecured creditors may be thus explained.

On October 11, 1919, soon after the organization of the mill, the Mason Company sold to it certain machinery, under a written contract of sale, wherein the Mason Company reserved title to the machinery sold, "until all payments of both cash, notes, and interest shall have been made in full, and proper receipt for same acknowledged by the seller." The machinery was delivered and installed, and the mill began operations. The contract was not recorded at the time or within 10 days after its execution, and not, as will be seen later, until April 23, 1923, more than two years after its date. In the meantime, that is, between October 11, 1919, the date of the contract, and April 23, 1923, the date of its record, the debts due to the objecting, unsecured creditors, were contracted.

In January, 1921, the affairs of the mill having become involved; negotiations were begun between the officers and stockholders of the mill on the one side, and its creditors on the other, looking to the operation of the mill by Wade H. Gray, president of the W. S. Gray Mill at Woodruff, S. C. These parties first met at Spartanburg, some time in 1921 prior to February 24. A committee of the creditors, consisting of Messrs. Norwood, Fiske, and Howard, was appointed to carry forward the negotiations. A second meeting was held at Greenville, on February 24, 1921, at which a formal agreement in writing was prepared. It was dated on that day, and on account of the scattered locations

of the various creditors a number of duplicate originals were prepared, containing this statement:

"That all copies of this contract, which may be executed by one or more of the creditors, shall be regarded as constituting one contract, having the same force and effect as if all the signatures were upon one copy."

It does not appear that any of the creditors signed the contract at that time, but eventually, at apparently different dates, the several forms of the contract despatched to the various creditors, were signed by all of the creditors with the exception of J. E. Sirrine Company, which claimed a mechanic's lien upon the property. Between February 24th and 28th, a meeting was held in Boston for the purpose of inducing the Mason Company and the Parker Company to sign the contract. There were present at this meeting, Mr. Cannon, the president of the mill, Mr. Cox, of the Mason Company, Mr. Gray, of Woodruff, Mr. Brennan, of New York, and Mr. Parker. The Mason Company signed the contract on March 25, 1921.

The contract, or "creditors' agreement," as it is called, purports to be an agreement between three parties, the mill, the creditors of the mill, and the committee above named, appointed at the Spartanburg meeting; it recites in the preamble that the mill had become involved, and that, having confidence in its ability to meet its obligations, there had been inaugurated a plan whereby a great majority of the stockholders should transfer their stock to the committee of stockholders, to be held by that committee until March 1, 1926, or until all debts shall be paid; and that the creditors had agreed to *extend the time of payments of their debts,* upon the terms and conditions set forth in the agreement. The agreement then proceeds to provide:

(1) That the agreement must be signed by 90 per cent. in amount of the creditors, and ratified by the stockholders of the mill.

(2) The duties of the committee.

(3) "Upon the execution of this agreement, each creditor shall forward to W. H. Gray, at Woodruff, S. C., a statement showing the items of its claim, and, if any lien is claimed, a copy of the paper constituting the basis of such claim."

(4) The extension by creditors of *the time for the payment of their debts,* for 5 years; *the payment of the company's indebtedness pro rata;* the execution of notes for its indebtedness to each creditor upon certain terms stated; renewals every 6 months; the retirement, *pro rata,* of the company's indebtedness, as rapidly as financial conditions warranted; the application of at least 50 per cent. of the net profits and surplus *toward the pro rata reduction of the indebtedness.*

(5) Arrangement for a commercial fund of $75,000.00 with which to operate the mill.

(6) Inhibition of any additional liens upon the property.

(7) Powers of the committee.

(8) "It is agreed that any creditor executing this agreement shall not be understood as waiving or releasing any lien which it may have upon any property of the company, but that the execution of this contract and the acceptance by such creditor of the notes herein provided shall be without prejudice to any such lien, and that the lien, if any, shall be preserved as though this agreement had not been executed by such creditor."

(9, 10) Relate to routine matters that do not concern the present controversy.

I think that it is perfectly clear that, under this agreement, every creditor who signed it, whether he had a lien or not, agreed to extend the time for the payment of his obligation for a period of 5 years, and that, *during that period,* all disbursements from the earnings of the mill should be made *pro rata* among all of the creditors, regardless of the existence of liens. Having made these provisions for the

extension of credit and for the equal *pro rata* distribution among all creditors *during that period of extension,* paragraph 8 was introduced as a precautionary provision, lest there should arise a contention that the liens existing had been *permanently* displaced. The provision for a *pro rata* distribution and paragraph 8 are both parts of the agreement; they must be construed together and both allowed efficacy, if reconcilable upon any reasonable theory. If paragraph 8 means that the rights of lien creditors might be enforceable during the extension period, such a conclusion would be absolutely repugnant to and irreconcilable with the provision for a *pro rata* distribution; the two are entirely reconcilable under the construction that, during that period the liens should be in abeyance, a *pro rata* distribution had, and at the end of the period the liens should resume their original efficacy.

The lien creditor loses much; he grants an extension of 5 years; he puts his machinery at the service of the unsecured creditor, subject to inevitable and constant deterioration; he waives his lien for the time and consents that all creditors shall share equally in the anticipated profits of the new regime; the unsecured creditor, conversely, reaps where he has not sown, where he has all to gain and nothing to lose, for if the temporizing plan should fail, his claim would be lost in the storm which would strand the ship, swamped by the secured claims.

His Honor, the Circuit Judge, holds that, under the case of *Carroll v. Cash Mills,* 125 S. C., 332; 118 S. E., 290, the claim of the Mason Company to priority must be sustained, unless it has waived its lien or has estopped itself from claiming it; in which he was entirely right, for that case decides:

"A valid reservation of title contract (equivalent to a chattel mortgage), recorded after the 10-day limit, and prior to receivership, is valid as against all general unse-

cured. creditors who become such between the time of the execution and the date of recording such instruments."

The burden is, therefore, upon the objecting, unsecured creditors, to defeat this *prima facie* right of priority, by showing waiver, estoppel, or other valid objection to its enforceability. The creditors in this proceeding claim that. it has been defeated by waiver, estoppel, and· fraud, one or all.

His Honor,, the Circuit Judge, sustained the report of the Master, which upheld the contention of the objecting, unsecured creditors.

I will now discuss the question whether there is any *legal* evidence in the case *even tending* to establish any one of these objections:

I. *As to waiver:* The definition of waiver, approved by this Court in many cases, is "the intentional relinquishment of a known right." It may be either express or implied. If claimed to have been express, it must appear to have been express, it must appear to have been a clear, unequivocal, and decisive act, showing such a purpose, and the result of an agreement supported by a valuable consideration. 27 R. C. L., 909; 40 Cyc., 263. If claimed to have been implied, it must appear that the opposite party has been misled to his prejudice into the honest belief that such waiver was intended or consented to. *Ibidem.* Under the circumstances warranting a conclusion of implied waiver, it is indistinguishable from estoppel.

There is no contention on the part of the objecting, unsecured creditors that there was an express waiver by Mason Company, either of its lien or of its right of priority over them; in fact, paragraph 8 of the creditors'. agreement contains a specific negation of all intention to waive those rights, in that it, by reiteration, distinctly reserves the lien and all rights under it, subject, as I have endeavored to show, to the agreement for an extension of time and distribution *pro rata* among all creditors during the *inter regnum:*

so that phase of the question may be dismissed from further consideration. That leaves the discussion applicable to implied waiver and estoppel which are practically identical.

Of course, if the circumstances are sufficiently strong to justify it, the Court might conclude that from the conduct or expressions of the lien creditor, whereby any unsecured creditor was led to alter his situation prejudicially, a case of implied waiver or estoppel would be presented.

The grounds upon which the unsecured creditors rely to defeat the claim of priority are conclusions they draw from the evidence in the case. The circumstances will be considered in detail.

(1) It is contended that the Mason Company waived or abandoned its claim to priority by failing to file with W. H. Gray, the new manager, a copy of the contract under which it claimed a superior lien, as provided for in Article 3 of the creditors' agreement, which is reproduced above.

It will be observed that the main purpose, in fact the sole purpose, of the creditors' agreement, was to establish a *modus vivendi*, an heroic remedy by which the life of the patient, threatened with paralysis, might be prolonged; a plan for the continued operation of the mill for the benefit of all of the creditors, regardless of liens, by which the lien creditors waived for the time being their liens, and all creditors, lien and otherwise, extended credit for 5 years, under the promise of a *pro rata* distribution of the earnings of the mill. There appeared no thought or purpose of a plan for the establishment and declaration of liens. There was not only no provision in the agreement imposing a penalty for not filing liens, but an express provision that nothing in the agreement should in any wise affect them. What difference could it possibly have made, looking to the purpose of the agreement, whether the liens were filed or not? If they had been filed, they would have lain dormant until the time of extension had expired or a new calamity overtook the sanguine hopes of the reorganizers.

Then was the only occasion upon which the filing would have been of any use, and as it was filed in this particular matter upon the happening of such calamity, I cannot see that any one was injured by the failure complained of, or that it furnished the slightest evidence of an intention on the part of the Mason Company to waive or abandon its lien or more properly speaking its claim to priority. As a matter of fact, its claim to a lien has never been disputed.

(2) The unsecured creditors further contend that a certain letter written by Mr. Howard, southern representative of the Mason Company, dated March 19, 1921, to Mr. Gray, in the name of the Mason Company, which contained an extract from a letter written by Mr. Cox, treasurer of the Mason Company, is evidence of a waiver or abandonment by the Mason Company of its claim to priority.

The letter was written 6 days before the date of the agreement as signed by the Mason Company, and contained this statement:

"You will also note what our treasurer says about Fiske-Carter Company's lien on the property, and in Mr. Cox's letter to me he says this:

" 'Builders, machinery makers, bankers, and supply creditors were to have no preference one over the other, and before we will allow you to deliver the signed copy of the agreement it must be understood that this mechanic's or workmen's lien is to be removed, as it would be unfair to all the rest of the creditors to allow this lien to remain, and then, if disaster overtook Mr. Gray's efforts, to wake up and find the Fiske-Carter people had this old lien on record."

From the disparity in dates it must appear that the treasurer's letter to Mr. Howard, dated *March 17th,* and Mr. Howard's letter to Mr. Gray, dated *March 19th,* were written before the Mason Company signed the contract, and whatever may have been Mr. Cox's intention on March 17th, it was entirely effaced when he executed the agreement on March 25th, which specifically and repeatedly de-

clares that the liens shall not be affected in any way by the agreement. If this letter could be construed into an interpretation by Mr. Cox of the formal agreement, signed more than a week afterwards, it was clearly inadmissible upon the ground that all preceding negotiations and declarations are to be deemed merged into the formal agreement, which is in direct conflict with such supposed interpretation, in the absence of ambiguity in the formal agreement. Paragraph 8 is as clear as language could make it. Not only does it expressly preserve all liens, but to remove all doubt it makes provision against a waiver of liens by creditors who sign. If the creditors read it, they could not misunderstand it; if they did not read it, they cannot complain of the consequence of their negligence. There is nothing ambiguous about this paragraph, its meaning is perfectly clear, and there can be no doubt but its purpose was to inform all creditors that some creditors had liens, and that these liens would be preserved by the agreement itself.

The Circuit Judge necessarily realized the correctness of the conclusion above stated. After reviewing the agreement, the Court says:

"I think it may be taken as granted that the language in each paragraph is plain, and in itself presents no element of doubtful construction which requires the aid of parol testimony to make it plain,"—but goes on to the conclusion that paragraphs 3 and 8, taken in conjunction, caused the ambiguity which allowed the admission of parol testimony.

It is apparent that the purpose of paragraph 3 was to inform Gray of claims and liens in order that he might ascertain the indebtedness of the mill, both secured and unsecured, and to issue notes in acknowledgment of the indebtedness. Cannon, the first president and treasurer, testified that a duplicate of the contract was kept at the mill and was with the records when Gray succeeded him, under appointment by the creditors' committee, and, in addition, Mr. Cox, treasurer of the machinery company, testified

that at a meeting in Boston that the contract was in the possession of Mr. Cannon and was examined by Mr. Gray and others. There was no necessity to give Gray notice of a claim by the machinery company, under paragraph 3, when Gray had knowledge of the existence of the lien and a duplicate was in the records of the mills. The filing of a lien being merely for information, the failure to file such lien had no effect under paragraph 8 which expressly preserved all liens. The only result of the failure by a creditor to file a lien was that it might be overlooked in the distribution of the assets, and the creditor would have no remedy.

Since the obvious purpose of paragraph 3 was to inform the president of the liens which were claimed, such information was unnecessary as to the claimant in this proceeding, since its claim was already a part of the record of the mills; and since the purpose of paragraph 8 was clearly to preserve for the creditors who signed the agreement the liens, which they had at the time the agreement was signed, it must be most obvious that there can be no ambiguity created by either of these sections, nor by the two taken together, and the effort to create such ambiguity is obviously forced.

Construing paragraphs 8 and 3 together, there is no inconsistency, no ambiguity; both are clear, and both may be given full effect; the former specifically preserves liens, the latter would merely require notice to be given, and, where there was knowledge, notice was unnecessary.

There being no ambiguity in the agreement, it is elementary, and all authorities hold that extrinsic evidence is inadmissible. If such evidence does not tend to vary the terms of the written instrument, it is irrelevant; if it does vary the terms of the instrument, it is inadmissible under the parol or extrinsic evidence rule. I deem it unnecessary to quote from the authorities, but will cite a few where these principles are clearly set forth: 22 C. J., pp. 1177,

1179; 10 R. C. L., § 208. *Cape Fear Lumber Co. v. Evans,* 69 S. C., 99, 101; 48 S. E., 108. *Carolina, C. G. & C. Railway Co. v. Seigler,* 24 S. C., 129. *Forbes & Co. v. Pearson,* 87 S. C., 69; 68 S. E., 964. *Coates & Sons v. Early,* 46 S. C., 229; 24 S. E., 305. Nor can such testimony be admitted to show an estoppel.

"Any theory that proof of prior and contemporaneous negotiations and representations, though not admissible to vary the terms or legal effect of the written contract, may be received for the purpose of raising an estoppel *in pais* has been held by the highest authorities to be a mere evasion of the salutary rule which protects written contracts from impeachment by loose collateral evidence, and, upon principle and authority, is not tenable." 10 R. C. L., 1017. *Connecticutt Fire Insurance Co. v. Buchanan* (C. C. A.), 141 F., 877; 4 L. R. A. (N. S.), 758.

I do not think this letter furnishes the slightest evidence of estoppel upon the Mason Company to insist upon its priority, even if it could be held admissible.

The burden is upon objecting creditors to show estoppel of Mason, and not one creditor has shown that he ever saw this letter before signing the agreement, or, in fact, until it was introduced in evidence in this case, more than two years after. Not one creditor said that he signed after the date of that letter, and it must be taken, and is no doubt true, that none did; no one said that he was influenced or misled by that letter; and it is the necessary conclusion here that no one was. The letter, therefore, furnishes no basis whatever for the plea of estoppel, and the Court can only conclude that it was no factor whatever on that issue and must be laid out of consideration here. It is obvious that no one could say that he was "misled to his injury" by the letter.

(3) It is further contended by the unsecured creditors that the silence of Mr. Cox at the Spartanburg, Greenville, and Boston meetings, as to the claim of the Mason Company

to priority, is evidence of its intention to waive the claim now presented.

As I have endeavored to show, the object in view in all of the preceding meetings, and as shown in the prefected agreement, was to affect an arrangement by which the mill would continue operations, the creditors to postpone the maturity of their claims for 5 years, the lien creditors in the meantime to suspend their liens, and the earnings to be distributed among all creditors regardless of liens. There was no occasion for the Mason Company to express its course of proceeding when the time limit of extension had expired or the working plan failed.

No matter what took place or what did not take place at the first meeting in Spartanburg, when "certain" creditors appointed a committee and put their stock in the hands of that committee to feel out the situation, or at the Boston meeting, no matter what agreement Mr. Cox wished drawn, when the creditors actually met in Mr. Haynsworth's office they drew it exactly the other way, and it is not claimed that there was any mistake by the draftsman or any fraud in connection with the actual drawing of the agreement. It is certainly shown above that there is, no ambiguity in the language of this agreement; therefore, the evidence antecedent to the signing of the contract is not admissible to show waiver, because the negotiations are conclusively presumed to be merged in the contract, in the absence of fraud. For a good statement of this doctrine, see also, 22 C. J., 1098–1104; see, especially, page 1220, § 1826. Only subsequent evidence can be considered to establish waiver of such contract rights: *United Firemen's, etc., Co. v. Thomas,* 82 F., 408; 27 C. C. A., 42; 47 L. R. A. 454. *Thompson v. Knickerbocker, etc., Co.,* 104 U. S., 252, 259; 26 L. Ed., 765, 768. The antecedent parol evidence is certainly inadmissible on "waiver," except as the claim of waiver is based on allegations of fraud.

"Parol evidence, admitted and admissible only for the

purpose of proving fraud in a written agreement, cannot be legally used to control or vary the terms of such agreement; that is to say, if the evidence is insufficient to defeat the instrument, it cannot be considered for any other purpose." 22 C. J., 1220.

(4) It is further contended by the unsecured creditors that it was the "understanding" of the creditors at the Greenville meeting on February 24, 1921, that the signing of the agreement would put all creditors upon an equal footing; that there would be no liens enforced.

The creditors undertook to have Mr. Fiske, of Fiske-Carter, creditors, to testify:

"It was the understanding, after the discussion of claims, that the signing of that instrument would put every one on an equal footing, that there would be no liens enforced. That was at the meeting in Mr. Haynsworth's office in Greenville when the creditors' agreement was drawn up."

And yet the Court is asked to believe that Mr. Haynsworth would have drawn the agreement with paragraph 8 in it, expressly preserving all of the liens, and everybody would sign it so.

In *Carson v. McCaskill,* 111 S. C., 516, 524; 99 S. E., 108, 111, our Supreme Court says:

"When an instrument is ambiguous, parol testimony is admissible to remove the ambiguity; but, except in cases of fraud, accident, or mistake, it is always admitted for that purpose, subject to the limitation that it must be consistent with the instrument, and, therefore, that it must not tend to contradict or vary its terms. *South Carolina Society v. Johnson,* 1 McCord, 41; 10 Am. Dec., 644. *Falconer v. Garrison,* 1 McCord, 209. *Milling v. Crankfield,* 1 McCord, 258. *Barkley v. Barkley,* 3 McCord, 269. *Railway v. Seigler,* 24 S. C., 124, 129. *Jones v. Quattlebaum,* 31 S. C., 606; 9 S. E., 982; 10 R. C. L., 1075, 1076."

Compare *Knighton v. Merc. Co.* 119 S. C., 340; 112 S.

E., 343, cited in *Land v. Reese,* 136 S. C., 267; 134 S. E., 257.

In the face of that statement their own witness, Mr. Cannon, president of the mill, testifies:

"That the purpose of the agreement was to put all creditors on the 'same basis'—not forever, as it is now contended against Mason—but 'for a period of five years.'"

Clearly, both statements were inadmissible as tending to vary the explicit terms of the written agreement.

(5) It is further contended by the unsecured creditors that the testimony of Fiske, Matthews, Leathers, and O'Neill, creditors, that they had heard nothing of the claim of the Mason Company to either a lien or priority over unsecured creditors, and that if they had done so they would not have signed the agreement, is evidence tending to show estoppel against Mason Company now setting up the claim presented.

I find nothing in the evidence to show that this testimony is anything more than an opinion *now entertained,* an afterthought, which, however honestly entertained *now,* is entitled to little consideration. In the first place, as I have before remarked, it was greatly to their advantage that this proposed arrangement should be carried out. It was the only thing that could possibly avert the wreck that was imminent and the submission of their claims; they wisely adopted the only course to escape the certain perils of bankruptcy,

"* * * dangerous rocks,
Which, touching but my gentle vessel's side,
Would scatter all her spices on the stream,
Enrobe the roaring waters with my silks."

Unfortunately, their hopes were not realized, but they took the chance, and the Mason Company showed a commendable spirit in making a sacrifice in the effort to save the ship.

They were not giving up anything; they were merely

giving the mill a chance to work out and pay them in full.
It was practically Mason's machinery, he having retention
of title contract; Mason, therefore, was doing more than
any one else, as he was allowing the use of his machinery,
with consequent deterioration, for 5 long years in an effort
to enable the mill to pay everybody in full. Yet these cotton
men say that they would have refused to sign if Mason
had refused to contribute his machinery to the common
enterprise by the cancellation of his retention of title con-
tract! Creditors say there was no secret that Fiske and
Sirrine had liens, yet they did not balk at signing the agree-
ment that Fiske and Sirrine should preserve their liens.
Would they have not taken the same hurdle if one other rail
had been added to the fence, or were they willing for the
other liens to be asserted and unwilling for Mason's lien to
be preserved?

(6) It is further contended by the unsecured creditors
that the interview between Mr. Cox and Mr. Norwood
at Spartanburg at which Mr. Cox asked Mr. Norwood
for a list of the secured creditors, which was furnished to
him without the name of Mason Company upon it, and
that Mr. Cox interposed no objection to the omission and
asked as to the probable dividend to unsecured creditors,
is evidence tending to show waiver or estoppel on the part
of Mason Company.

The Circuit Judge has found as a fact to which there
is no exception, and a fact stressed by counsel for the re-
spondents, that the claim of Mason Company to priority
is an afterthought, inspired by the decision of this Court
in the *Carroll v. Cash Mills* case. If it be true, there can be
no waiver of a right which was not known at the time of
the alleged waiver. 21 C. J., 1166, 1167. *McGee v. Hall,*
26 S. C., 179; 1 S. E., 711. *Chambers v. Bookman,* 67
S. C., 432; 46 S. E., 39; 40 Cyc., 256, 259, 261.

There could be no estoppel, for the conversation occurred
long after the agreement had been executed. I do not think

that there is the slightest evidence in the case tending even to establish fraud on the part of the Mason Company. The well-recognized rule is thus clearly stated in 21 C. J., 1119:

"In order to constitute this kind of estoppel there must exist (1) a false representation or concealment of material facts; (2) it must have been made with knowledge, actual or constructive, of the facts; (3) the party to whom it was made must have been without knowledge or the means of knowledge of the real facts; (4) it must have been made with the intention that it should be acted upon; (5) and the party to whom it was made must have relied on or acted upon it to his prejudice. To constitute an 'estoppel *in pais*,' 'there must occur an admission, statement, or act inconsistent with the claim afterward asserted, action by the other party thereon and injury to such other party.' The complaining party must be 'misled to his injury.' "

See, also, Pom. Eq. Juris, 805. *Cannon v. Baker,* 97 S. C., 116; 81 S. E., 478. *Gaston v. Brandenburg,* 42 S. C., 348, 351; 20 S. E., 157, citing Bigelow on Estoppel (3d Ed.), 434. Not one of these essential elements appears.

For these reasons I think that the Circuit decree should be reversed, and that the case should be remanded to the Circuit Court for further proceedings in harmony with the foregoing conclusions.